This is an appeal by Federal Land Bank of New Orleans (Bank) and a cross-appeal by Glenn E. and Lynn L. Jones (the Joneses) from judgments entered against them in favor of multiple claimants. The actions arose from a loan made by the Bank to the Joneses and the Land Bank Association of Selma (Association) for long-term financing to cover the construction costs of a new residence. The construction contract provided for three monetary disbursements to the original contractor, Webb A. Hargrove d/b/a Azalea Construction Company (Hargrove or Azalea), upon certain stages of completion of the residence.
The Association made two disbursements to Hargrove, and he failed to pay the subcontractors and materialmen who were working on and supplying materials for the Jones residence. Consequently, a subcontractor, Central Alabama Sheet Metal Company (Central), commenced an action in the district court asserting claims against Glenn Jones on open account and for work and labor done. The action proceeded to judgment, and Jones appealed to the circuit court. Tillery House of Carpets (Tillery), another subcontractor, also commenced an action against Glenn Jones in the district court to enforce a materialmen's lien upon the Joneses' home and sought money damages for work and labor done.
Subsequently, the Bank instituted an interpleader action in the circuit court, naming the following defendants: the Joneses, Central, Tillery, Hargrove, Rawls Machine and Supply Company (Rawls), Johnny Brown Plumbing Company (Brown), Henry Brick Company, Inc. (Henry), Dallas Concrete Pipe Company, Inc., Johnny Lee Gilmore, Warrior Concrete Company, and Prince Electric Company.
Brown, Rawls, and Henry filed cross-claims against the Joneses. The Tillery action and the appeal from the judgment in the Central action were later consolidated with the Bank's interpleader action, and Central and Tillery cross-claimed against the Joneses.
The Bank sought to interplead into court the sum of $6,078.50, which remained undisbursed under the construction loan to the Joneses. The complaint requested the court to determine how the money should be disbursed between the Joneses and the other defendants who were materialmen and subcontractors.
The Joneses answered and counterclaimed against the Bank, alleging, among other things, the following:
 "15. Plaintiff assumed the obligations of a Trustee with respect to the supervision of the construction and disbursement of the loan proceeds. Plaintiff also assumed the obligation to use reasonable and ordinary care in the supervision of the work and the disbursement of the loan proceeds. Plaintiff breached those duties owed by it to Jones [the Joneses], and by reason thereof and as the proximate result and consequence thereof Jones has suffered loss and damages as follows: They were required to expend considerable sums to complete the house; they have been subjected to litigation and claims for unpaid bills and materials; their title to said real estate has been impaired by the liens and claims filed against it by the Defendants herein; they have incurred substantial expenses *Page 3 
for attorneys fees and other costs in the completion of the property, and the defense of the claims and litigation against them; they were required to pay $6,255.00 to Klinner to complete the work; they were required to pay $2,400.00 to complete the fireplace; they suffered loss and damages of $1,500.00 by reason of the failure to install the sink and two windows as aforesaid, and the further sum of $2,000.00 by reason of the failure to build the house according to the required inside and outside measurements; they suffered mental anguish; they were required to pay monthly rentals for a substantial period of time, during which time they were also required to pay interest to Plaintiff on the full amount of the original construction loan; they have been required to pay Plaintiff interest on the full amount of the construction loan, although they were deprived by Plaintiff of the use of $12,333.50 for a substantial period of time; and they were required by Plaintiff to pay interest on funds which have been retained by or under the control of Plaintiff.
 "16. Plaintiff has also abused the process of this Court by filing this Interpleader action, and by naming and joining therein those Defendants who did not have or assert any lien or claim against the real estate of Jones or any unpaid balance due by Jones to Azalea. Plaintiff took such action to protect its own interest, because of claims asserted directly against Plaintiff by Henry and certain other of the Defendants herein. Plaintiff is not a mere stakeholder with respect to those funds, but is instead a direct party in interest and seeks to use Jones' funds to pay or protect against claims asserted by the Defendants herein directly against Plaintiff. Such action by Plaintiff is wrongful and tortious, and constitutes an abuse of the processes of this court, and by reason thereof Jones have been damaged in the manner and as averred in the preceeding Paragraph 15."
The Joneses also cross-claimed against Tillery, Brown, Rawls, Central, and Henry and asked for a declaratory judgment, declaring:
 "a. That Jones [the Joneses] is not indebted to any of the Defendants herein.
 "b. That Jones has paid or is entitled to credits in the total sum of $44,721.50 under [their] original contract with Azalea or Hargrove; that Azalea and Hargrove are obligated to refund said over-payment to Jones; and that Jones has no funds in their possession or under their control due to Hargrove and Azalea under said construction contract.
 "c. That none of the Defendants herein have any right, claim, or interest in or to any of the proceeds on deposit with this Court, and that all of said deposits, including interest thereon, is the property of Jones and should be disbursed directly to Jones.
 "d. That Plaintiff assumed the obligations of a Trustee to Jones with respect to the supervision of the construction and the disbursements of the loan proceeds; that Plaintiff breached said duties; that Jones was damaged as herein averred; and that Jones is entitled to a judgment against Plaintiff in the sum of $50,000.00, actual and punitive damages, and costs.
 "e. That Plaintiff owed a duty to Jones to use reasonable care and diligence in supervising the construction and in disbursing the loan proceeds; that Plaintiff breached said duties; that Jones was damaged as herein averred; and that Jones is entitled to a judgment against Plaintiff in the sum of $50,000.00, actual and punitive damages, and costs.
 "f. That Plaintiff has abused the processes of this Court by filing this Interpleader proceeding; that Plaintiff is not a mere stakeholder, but is a direct party in interest and has attempted to use funds belonging to Jones in order to pay, satisfy, or delay claims asserted directly against Plaintiff by Henry and other creditors herein; that by reason of such tortious conduct Plaintiff is obligated to *Page 4 
Jones in the amount of $50,000.00, actual and punitive damages, and costs."
During the trial, the Joneses amended their counterclaim against the Bank to allege that the Bank wantonly controlled and disbursed the loan proceeds, misrepresented to the Joneses that the Bank would pay materialmen and subcontractors, required the Joneses to execute false lien waivers, and committed the tort of outrageous conduct which resulted in additional damages to the Joneses' reputation, and caused humiliation, mental anguish, emotional pain, and stress.
The Bank in its answer denied the allegation of abuse of process and filed a motion to dismiss the counterclaim, based upon the absence of a fiduciary relationship and the absence of a duty owed to the Joneses. The trial court overruled the motion. In addition, the Bank's answer to the Joneses' counterclaim affirmatively set up the defense of statute of limitations, and by amendment affirmatively pleaded contributory negligence by the Joneses and estoppel on the abuse of process claim.
Rawls also counterclaimed against the Bank, averring that the Bank had guaranteed payment for all building materials furnished by Rawls on the Jones job. Rawls initially sought damages in the amount of $11,509.22, but he later amended the counterclaim, alleging false representations by the Bank and claiming punitive damages for $100,000.00.
Brown filed a counterclaim on similar grounds, seeking judgment for $1,208.68. He later amended the counterclaim to ask for $5,000.00 punitive damages for alleged false representations.
Henry counterclaimed for $1,393.25 on open account for brick sold to the Bank. Henry, Rawls, Tillery, and Central filed a joint amended counterclaim against the Bank seeking attorney's fees.
The Bank moved to dismiss all counterclaims and that motion was overruled by the trial court. The Bank's answer denied all allegations of the counterclaims and affirmatively pleaded the defenses of Statute of Frauds, statute of limitations, and contributory negligence.
Evidence was presented before the circuit court without a jury. The court announced its decision from the bench April 23, 1982, and final judgment was filed July 2, 1982. The judgment was amended on July 25, 1982.
The following judgments were rendered against the Bank:
 I. (1) Henry Brick $ 8,083.83 (2) Brown 7,803.22 (3) Rawls 82,275.23 (4) The Joneses 238,509.06
 II. The Bank was required to account to the Joneses for interest improperly charged on the $6,078.50 paid into court and to pay the Joneses the $6,078.50.
 III. The Bank was also required to pay attorney's fees out of the funds paid into court as follows:
 (1) Tillery $ 2,275.00 (2) Central Bank 1,375.00 (3) The Joneses 2,428.00
The trial court denied the Bank's post trial motions and the Bank appealed October 7, 1982.
The following judgments were entered against the Joneses in favor of:
 (1) Tillery $ 2,021.60 (2) Brown 1,302.61 (3) Central 655.60 (4) Rawls 12,775.23 (5) Henry Brick 1,583.83
On October 21, the Joneses filed their notice of appeal.
A number of issues are presented by the Bank's appeal; however, in view of our conclusion that the issue of agency is the controlling one, we need not reach other issues posed by the Bank's appeal. That controlling issue is whether or not the trial court could have found that the officers of the Association were the agents of the Bank and that, accordingly, their actions bound the Bank. In that connection, the Joneses alleged in their counterclaim that the Bank assumed the duties of trustee for the Joneses, and in their brief the Joneses characterized these alleged duties as those *Page 5 
of a "quasi-trustee." It is apparent that throughout the litigation below the parties tried the case against the Bank on the theory of agency. Rule 15 (b), A.R.Civ.P.
Among other things, the Joneses alleged in their counterclaim, and now allege in brief, that the Bank voluntarily assumed the duties of a quasi-trustee and breached its fiduciary duties to the Joneses of fairness and good faith. They state that "the Land Bank voluntarily assumed and exercised direct control not only over the disbursement of the loan, but also over supervision of construction, payment of suppliers and subcontractors, and over the ordering of materials."
As a corporate entity, the Bank can only act through its duly authorized agents, servants, or employees. Alabama Music Co. v.Nelson, 282 Ala. 517, 213 So.2d 250 (1968). From the evidence presented at trial, the only three possible agents of the Bank were H.D. Ellzey, Ken Gresham, or Rosemary Harris, the president, vice president, and assistant vice president-treasurer, respectively, of the Federal Land Bank Association of Selma.
The Joneses dealt only with the local Association officers and had no direct dealings with the Bank; therefore, under the peculiar facts of this case, any relationship between the Joneses and the Bank would of necessity be based upon a finding of agency between the Bank and the Association. The trial court did not specifically find that the officers of the Association were the agents of the Bank; however, such a finding is implied by the trial court's judgments in favor of the Joneses, Rawls, Brown, and Henry, and against the Bank. Rawls, Brown, and Henry, like the Joneses, dealt only with the officers of the local Association and not with the Bank. Because all of the parties dealt with the local Association officers, and not the Bank, their claims, if found to be valid, also must have been based upon an agency relationship between the Bank and the Association. In the absence of such a relationship, the Bank cannot be held liable for the actions of Ellzey, Gresham, or Harris. In that case, the Joneses' claim that the Bank assumed representative duties must fail along with all of their other claims against the Bank, and the claims of Rawls, Brown, and Henry against the Bank as well.
The Bank asserts that the officers of the Association did not act as its agents in the Jones transactions, and that the trial court should be reversed for finding that the Association officers were the Bank's agents. In support of its position, the Bank cites several Alabama decisions in which this Court held that Association employees are not the agents of the Bank.
The first of these decisions is Gantt v. Gunter, 225 Ala. 679,145 So. 146 (1932). Plaintiff brought an ejectment action against a mortgagor, who defended on the basis of mental incapacity to make a valid mortgage. The issue before this Court was "whether, in the matter of making a loan and obtaining a mortgage from the borrower, the National Farm Loan Association, or its executive officer, the secretary-treasurer, is the agent of the Federal Land Bank in such sort that notice to him of the mental status of the mortgagor is notice to the bank." 225 Ala. at 679, 145 So. at 147. This Court stated that the question is one of law and briefly discussed the structure of the Federal Land Bank and National Farm Loan Association:
 "[They] are both parts of the system, but each is a distinct body corporate with prescribed powers and duties.
 "The members of the association are borrowers from the Federal Land Bank by mortgages on farm lands. Each member is a shareholder in the association.
 "A farmer desiring a loan makes application for membership in the association. The association determines in the first instance, whether the applicant is acceptable. To be acceptable he must be eligible to a loan on a mortgage on farm lands. 12 USCA §§ 741, 745.
 "If acceptable, the association joins in the application to the Federal Land Bank for the loan, and in connection therewith the association subscribes for stock in *Page 6 
the bank to an amount equal to 5 per centum of the loan, which stock shall stand as collateral security for the loan. 12 USCA § 721.
 "In other ways the association is empowered to stand sponsor for the member it has recommended to the bank. 12 USCA § 761.
 "When the loan is effected the borrower becomes a shareholder in the association, and the association a shareholder in the bank. 12 USCA §§ 733, 721.
 "Thereafter, the secretary-treasurer of the association, who need not be a member, becomes the law appointed agent to receive and pay over monies going from the bank to the borrower, or from the borrower to the bank. 12 USCA § 714.
 "This is sufficient to clearly demonstrate that in the matter of passing upon the fitness of the applicant for membership, mental or otherwise, and his consequent right to a loan, neither the association nor its executive officer, the secretary-treasurer, is an agent of the bank. To the contrary the association is an actor with and for the applicant as defined by law. The bank at New Orleans finally determines whether the loan shall be made.
 "The true rule seems to be that the powers of the secretary-treasurer are of a public or quasi public character, defined by law.
 "The association and its secretary-treasurer have, therefore, a distinct law-made status or autonomy.
Persons dealing with him are charged with knowledge of such powers. In any event we agree with other courts who, so far as we find, have uniformly held the secretary-treasurer of the association is not the agent of the bank in matters such as here presented. Bjorkstam v. Federal Land Bank, 138 Wn. 456, 244 P. 981; Byrne v. Federal Land Bank, 61 N.D. 265, 237 N.W. 797; Federal Land Bank v. Shingler, 174 Ga. 352, 162 S.E. 815, 823; Whitaker v. Fulton (Tex.Civ.App.) 17 S.W.2d 1079, 1082." (Emphasis added.) 225 Ala. at 680, 145 So. at 147.
Next, the Bank cites Hinds v. Federal Land Bank of NewOrleans, 235 Ala. 360, 179 So. 194 (1938). In that case, the Bank brought an action to quiet title and defendants filed a cross-bill seeking an accounting and damages against the Bank for misappropriating the money borrowed and alleging the following:
 "that the application for said loan was made through the National Farm Loan Association of Hulaco, embodying a list of the creditors of said Hinds, Sr., with the amount of each claim to be paid with interest, and that said Farm Loan Association, after the money came into the hands for distribution, acting as the agent of the bank, misapplied the funds, in that it paid to said creditor claimants more than they were entitled to receive and thereby exhausted the fund, in consequence of which the borrower received nothing, causing him to suffer damages, and if the amount so misapplied and the damage which the borrower suffered is ascertained and applied on the mortgage debt there was no default in the payments at the time of the foreclosure, and said foreclosure was unauthorized, wrongful, and oppressive." 235 Ala. at 362-63, 179 So. at 196.
This Court held:
 "It is a matter of which the courts take judicial knowledge that National Farm Loan Associations, organized under the Federal Farm Loan Act of Congress, have a separate, corporate entity from federal land banks; that they are an association of the borrowers, each borrower becoming a shareholder therein, and when funds constituting a loan reach the hands of the association the law confers on the association and its officers the duty of applying the funds to claims as authorized by the application, and, in doing so the association and its officers do not act as the agent of the bank.
12 U.S.C.A. §§ 720, 721; Federal Land Bank of Columbia, South Carolina v. Gaines, 290 U.S. 247, 54 S.Ct. 168, 78 L.Ed. 298; Gantt v. Gunter, *Page 7 225 Ala. 679, 145 So. 146; Hooper v. Federal Land Bank of Columbia, 178 Ga. 571, 173 S.E. 415.
 "If the fund constituting the loan was misapplied after it came into the hands of the Federal Farm Loan Association, the remedy of the borrower is against said association, its secretary, or the creditor who received more than he was entitled to be paid."
(Emphasis added.) 235 Ala. at 363, 179 So. at 196.
Again, in Federal Land Bank of New Orleans v. First NationalBank of Scottsboro, 237 Ala. 84, 87, 185 So. 414, 416 (1939), this Court reaffirmed the rule followed in Gantt and Hinds,supra: "[T]he association, in supervising the distribution of the funds, was not the agent of the complainant Bank, but acted for the borrower, and itself as a guarantor of the loan."
In Hinds and First National Bank of Scottsboro, this Court relied on Federal Land Bank of Columbia v. Gaines,290 U.S. 247, 54 S.Ct. 168, 78 L.Ed. 298 (1933). Gaines was a suit brought by a borrower to cancel her mortgage given to the Bank as being invalid for failure of consideration. Mrs. Gaines, the borrower, applied to the Bank, through the Columbia Farm Loan Association, for a loan. She executed a promissory note to the Bank secured by a mortgage upon her land. The loan check, payable to the secretary-treasurer of the local association and Mrs. Gaines, was endorsed by the payees and deposited in a bank to the credit of the association. Immediately after collecting the check, the bank closed and the proceeds became unavailable to Mrs. Gaines and the association.
The Supreme Court of North Carolina concluded that, under the provisions of the Federal Farm Loan Act, the association was an intermediary between the borrower and the Bank and acted as a public agent in receiving and depositing the check. The court held that the loan check had not been received on behalf of Mrs. Gaines by the association and that, accordingly, she was not liable on the note.
The United States Supreme Court granted the Bank's petition for writ of certiorari and, after reviewing the case, reversed the North Carolina court, stating:
 "The state court rested its decision on the characterization of the association as a public agent, but it did not hold that the association was in any sense an agent for the lender bank. It could not well have done so, for neither the provisions of the Farm Loan Act nor the particular circumstances which attended the loan in the present case gave to the petitioner any right of control over the association or any power to recall the check or its proceeds after its delivery and collection. The association was controlled by directors, elected by its own members, who, like the respondent, were borrowers. After the check was delivered to the association, it passed completely from the control of the lender and into the exclusive control of the payees who were the obligors of the mortgage indebtedness.
 "It is true that both the petitioner and the association were, in a broad and general sense, public agencies or instrumentalities to carry out a policy of the government — the extension of credit to those engaged in agriculture to be availed of in the furtherance of agricultural undertakings. But those purposes could only be achieved through loans made to private individuals. The borrower is under no legal compulsion to borrow. If he takes the benefit of the privilege extended by the statute, he can do so only in compliance with its requirement that he shall join, with himself as obligor, the local co-operative association of which he is a member. This supplies a strong incentive on the part of the associations to perform the duties commanded by the statute, looking to the safety and security of the loan and, as agreed by the borrower and required by the statute, its disbursement for the purposes for which it is made. By applying for the loan and delivering to the lender her mortgage and note, endorsed by the association, in compliance with the act, respondent consented *Page 8 
in advance to the procedure for creating and disbursing the loan which the statute prescribes. She renewed that consent when her indorsement of the check was made, with full knowledge that the association, her co-obligor, was to deposit the check to its credit and disburse the proceeds for the purposes for which the loan was made. This consent could not be affected by the closed loan statement which it was intended she should later sign. The statement was to be merely a confirmation or report of what had gone before. The indorsement of the check was the crucial act, for it drew the funds from the control of the petitioner and dedicated them irrevocably to the purposes for which the loan had been secured." (Emphasis added.) 290 U.S. at 254-55, 54 S.Ct. at 171.
In the Gaines decision, supra, it appears that the Federal Land Bank issued one check representing the loan funds to the borrower and the local association which was subsequently endorsed by the payees and deposited to the credit of the association.
This Court cannot determine from the record in the present case the method of transfer of the loan funds from the Federal Land Bank in New Orleans to the Joneses and the Association. The logical assumption is that the Bank transferred the loan funds to an account in the name of the Association, because the disbursement checks were drawn on the Hibernia National Bank in New Orleans in the name of the Association and signed by Ken Gresham, vice president. No evidence can be found in the record that the Bank had any power to recall the loan proceeds.
The Joneses, Rawls, Brown, and Henry assert that certain statements by Gresham and Ellzey at trial support a finding of agency in fact between the Association and the Bank. On cross-examination, Gresham testified in part:
 "Q. Mr. Gresham, I believe you've testified that you are a vice president with the Federal Land Bank?
"A. Yes, sir.
"Q. Which association are you connected with?
"A. Selma.
 "Q. You are vice president of the Federal Land Bank Association of Selma?
"A. Yes, sir.
 "Q. Is that the entity that made this mortgage and handled the transaction?
 "A. That is the association that handled the transaction.
 "Q. And the mortgage of course was with the Federal Land Bank of New Orleans?
"A. Yes, sir.
 "Q. Do you hold any official position with that corporation or organization?
"A. No, sir.
 "Q. Your duties are performed for the local association but in turn for the parent company; is that right?
"A. Yes, sir."
Several excerpts from Ellzey's testimony are set out below:
 "Q. Well, let me ask you this, Mr. Ellzey. Ken Gresham was vice president or is a vice president?
"A. Yes.
 "Q. And he was during the time that the loan was made and all subsequent proceedings were had was he not?
"A. Yes, sir.
 "Q. What were his duties with respect to this particular loan?
"A. He was to handle the loan.
 "Q. So Ken was authorized fully to do any and all things in connection with this loan on behalf of the Federal Land Bank?
"A. Yes, sir.
". . . .
 "Q. Now, you testified in your words you shut her down after you learned that the unpaid creditors were out there?
"A. Yes.
 "Q. What action did the Land Bank take at that point? *Page 9 
 "A. We discussed the matter with our counsel and with the Land Bank in New Orleans.
 "Q. And based on those discussions what action did you take if any?
 "A. The action we took — and I'm going to paraphrase this. They recommended that Jones — that he acquire another contractor to finish the house because our security was the house and without it being completed it wasn't any good and the other thing that they decided was that the money should be — whatever was remaining be paid into court.
". . . .
 "Q. Now, you did know that Tommy Klinner was going to finish the house did you not?
"A. Yes, sir.
 "Q. And you certainly approved the payment after he finished the house didn't you?
"A. Yes, sir.
 "Q. But you're denying that the Land Bank was a party authorizing that work?
"A. I'm denying that I authorized.
"Q. Oh. Oh.
"A. In behalf of the Federal Land Bank.
 "Q. My question then did the Federal Land Bank authorize it?
"A. I can't imagine them doing it.
"Q. You can't imagine it?
 "A. Not without going through me since I'm their representative.
". . . .
"Q. Did you authorize the interpleader?
 "A. Yeah. I authorized — to act — to give us advice that acted in the best interest of everybody concerned. And I followed that advice.
 "Q. So that decision was based on Mr. Pitts' advice to file an interpleader; is that your testimony?
 "A. And in conjunction with the Federal Land Bank of New Orleans.
 "Q. What about the decision to disburse the money to Mr. Klinner?
"A. That was a concert decision.
"Q. Also?
"A. Right.
"Q. Based on Mr. Pitts' advice?
 "A. Based on that and the Federal Land Bank of New Orleans's advice. Our obligation was to finish the house."
Contrary to the assertions of the Joneses, Rawls, Brown, and Henry, however, agency is not determined by how the parties characterize their relationship, but by the facts of the case.Semo Aviation, Inc. v. Southeastern Airways Corp.,360 So.2d 936 (Ala. 1978). In the present case, the controlling statutes clearly provide for the creation of two autonomous entities, and the courts interpreting those statutes have recognized that statutorily there is no agency relationship between the Bank and the Association. (See preceding discussion of these decisions.) The Court in Gaines implied that particular circumstances attending a loan giving the Bank a right of control over the Association, or power to recall the loan funds, might create an agency relationship [in fact]. Alabama law is in accord with Gaines, because one of the facts necessary to establish agency in Alabama is a right of control by the principal over his agent. Wood Chevrolet Co. v. Bank ofthe Southeast, 352 So.2d 1350 (Ala. 1977). Therefore, absent a showing that the Bank had some power to control the Association, Gresham's testimony that his duties were performed for the local association but in turn for the "parent company" is not conclusive on the question of whether he was authorized to act on behalf of the Bank as its agent in the Jones transactions. Similarly, Ellzey's statements that he was the Bank's "representative" and that Gresham was authorized to do anything in connection with the loan on behalf of the Bank do not create an agency relationship. Our review of the record disclosed no factual basis for these statements by Gresham and Ellzey.
Ellzey also stated that the Bank "recommended" that the Joneses acquire another contractor to finish the house, and they "advised" the Association to file the interpleader and disburse money to the second *Page 10 
contractor. These statements do not show that the Bank had a right to control the Association; instead, they show that the Bank counselled the Association, the guarantor on the loan, on how to protect the Association's interest.
The burden of proving agency rests upon the party asserting its existence. Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 281 So.2d 636 (1973). The Joneses, Rawls, Brown, and Henry did not meet this burden, and the judgments in favor of them against the Bank are due to be reversed.
Because this Court has determined that the Bank had no control over the funds and, therefore, was not the proper party to interplead them, this case must be remanded to the trial court for further proceedings to determine to whom the interpleaded funds should be paid.
The next issue with respect to the Bank's appeal is whether the trial court erred in requiring the Bank to account to the Joneses for interest charged to them on the sum interpleaded. The trial court found that the interpleader constituted an abuse of process, and that, therefore, the sum interpleaded continued to belong to the Bank. This Court agrees that the Bank must account to the Joneses for the interest charged to them on the funds sought to be interpleaded by the Bank, but our conclusion is not based upon abuse of process grounds. Rule 22, A.R.Civ.P., provides:
 "Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability."
The interpleaded funds could not have been treated as a disbursement because of the nature of an interpleader action. The stakeholder in an interpleader action admits that he is uncertain as to whom the stake belongs. See Finn v. MissouriState Life Ins. Co., 222 Ala. 413, 132 So. 632 (1931). It is inconsistent for the stakeholder (the Bank here) to claim, on the one hand, that he is uncertain about the owner of the funds and then, at the same time, to claim that the funds have been disbursed to a particular party who is chargeable with interest on those funds. Thus, the trial court's judgment requiring the Bank to account to the Joneses for interest charged on the money interpleaded is due to be affirmed.
The Joneses cross-appeal from judgments entered against them and in favor of Tillery, Brown, Central, Rawls, and Henry (82-65). The trial court made no specific findings disclosing the theories upon which those judgments were based. "In the absence of specific findings of fact by the trial court, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous and against the great weight and preponderance of the evidence." Hand v. Stanard,392 So.2d 1157, 1159 (Ala. 1980).
The record in the case at bar is long, confusing, and consists in major part of handwritten pleadings which are difficult to decipher. Some of the claims asserted against the Joneses were presented in a form designated as "Summary of Claims" and apparently these were intended to serve as pleadings in the nature of amendments to cross-claims. This Court has searched the record, and it appears that Tillery filed counts of open account and for work and labor done; Rawls apparently filed on open account; Henry also apparently filed on open account; Brown apparently filed on open account, and for work and labor done; and Central apparently filed a count for work and labor done. The question then becomes whether or not the trial court's presumed findings under those theories were supported by the evidence.
 The Tillery Judgment
The Joneses allege that they never contracted with Tillery to pay for the carpet installed in the house, and that Tillery dealt only with Hargrove. Therefore, they assert that the trial court erred in entering the judgment against them, which was *Page 11 
entered jointly against Hargrove in favor of Tillery in the amount of $2,021.60.
Tillery's claims were apparently based upon recovery for work and labor done and open account, and this Court assumes that the trial court found that Tillery was entitled to recover on those theories. The trial court heard the evidence without a jury and its findings based upon that evidence are presumed correct in the absence of palpable error. First Alabama Bank v.Coker, 408 So.2d 510 (Ala. 1982).
James Tillery testified at trial:
 "A. They [the Joneses] were within the price range and when I give a price well then they seemed like it was satisfactory with them. As far as telling them they were, I didn't quote them a price, I just said they were within their price range. And then at that point I wanted to know before we went any further who was going to pay for it.
"Q. Did you ask Mr. Jones that?
 "A. Yes, sir, I did. And at this time he said that Hargrove and Azalea Building. I said well I didn't know a thing about Hargrove and Azalea Building. I don't know them. But I said on the basis of him — and he was a policeman, I said on the basis of you and you being married to a LaPorte and you're local I said I'll go ahead and order the material for you.
 "Q. Did he say anything about how you were to get paid?
 "A. He told me the same afternoon, the 7th or 8th, that afternoon, that he would guarantee my money and that he would bring by an affidavit and get me to sign it showing that I had received my money before he closed the house out.
". . . .
"Q. Who did he say was going to pay you?
 "A. He never did — he guaranteed it and I never did ask him. I was looking to Mr. Jones.
"Q. Did you ever talk to Mr. Hargrove at all?
"A. No, sir.
". . . .
 "Q. So he [Jones] could either pay that to the contractor who would pay you or he could buy the carpet himself and pay you?
 "A. Right. Just so I got my money that was it. And I was looking to Jones for it. I was dealing directly with Jones."
This evidence was sufficient to support a finding by the trial court that the Joneses were obligated to Tillery on an account. Accordingly, the trial court's judgment is due to be affirmed.
 The Rawls Judgment
The Joneses assert that the judgment in favor of Rawls and against them is clearly erroneous and contrary to the great weight of the evidence in this action. They cite the following testimony by Rusty Rawls in support of their assertion that Rawls was looking to the Bank and not to the Joneses for payment:
 "Q. Mr. Rawls, with respect to this account that you've testified to, who did you extend the credit to?
 "A. I extended the credit in my own mind to the Federal Land Bank. Because I wouldn't have sent the first dime out there without them."
Both the Joneses and Rawls cite the following testimony by Rawls in support of their position:
 "Q. All right. If Mr. Gresham hadn't guaranteed your payment at the beginning would you have extended any credit to Mr. Jones and Mr. Hargrove?
"A. No, sir."
Rawls claims that the preceding excerpt shows that he extended credit to the Joneses as well as the Bank. Additionally, Rawls asserts that there is ample evidence to support a finding for him against the Joneses on open account based upon quasi-contract.
This Court discussed the remedy of quasi-contract in OpelikaProduction Credit Association, Inc. v. Lamb, 361 So.2d 95, 99
(Ala. 1978): *Page 12 
 "Under modern authorities, the remedy has been expanded to reach benefits other than money received. A person may be considered to have conferred a benefit upon another if he has given him possession of, or an interest in, land, chattels, or choses in action, or if he performs some service which is beneficial to or at the request of the other person, or if he satisfies a duty on a debt of the other. Whenever one person adds to the other's advantage in any form, whether by increasing his holdings or saving him from expense or loss, he has conferred a benefit upon the other. Restatement, Restitution, § 1 (b); Sullivan, The Concept of Benefit in the Law of Quasi-Contract, 64 Geo.L.J. 1 (1975).
 "The remedy of quasi-contract is founded upon the familiar principle of avoiding unjust enrichment. Where the plaintiff has suffered a detriment, and the defendant has received a benefit as a result, it is said that justice demands the repayment by the defendant of the plaintiff's loss. The measure of the defendant's liability is, however, limited to the value of the benefit received, whether or not it is equal to, less than, or greater than the plaintiff's loss. But, in any case, there must be a detriment, and a resulting benefit, and the two must be related. . . ."
The Joneses clearly received a benefit by having Rawls deliver supplies and materials to be used in their house. Likewise, Rawls clearly suffered a detriment in the amount of $12,775.23. Accordingly, the trial court's judgment for Rawls is due to be affirmed because there was sufficient evidence from which the trial court could find for Rawls under the theory of quasi-contract on the count of open account or goods sold.
 The Henry Judgment
Doug Sellers testified as follows in connection with the claim of Henry Brick:
"Q. He [Jones] said what, Mr. Sellers?
 "A. Said he needed brick for his house and the number he needed. And he said go ahead and bill it to the Federal Land Bank.
"Q. Why did he say do that?
"A. Because we would not bill it to Webb Hargrove.
"Q. Did he indicate why the Federal Land Bank?
 "A. They were financing the construction of his home.
"Q. And did you bill it that way?
"A. I billed it that way.
 "Q. And I show you Defendant Henry Brick Exhibit No. 16 which is an itemized account, Mr. Sellers. Is that the amount of the total account for the brick that went in Mr. Jones's home?
"A. Right.
"Q. And that's $1,393.25?
"A. Right."
Therefore, Henry suffered a detriment in the sum of $1,393.25, plus interest accrued, and the Joneses received a benefit by having the brick installed in their house. The Henry judgment against the Joneses is due to be affirmed for the same reasons supporting the Rawls judgment.
 The Brown Judgment
J.M. Brown testified that he installed plumbing in the house and that the amount owed to him was $1,208.68. The Court entered judgment for that amount plus interest. Under the rationale set out in the Rawls discussion, the Brown judgment is due to be affirmed.
 The Central Judgment
The Joneses allege that the judgment in favor of Central and against them is erroneous and contrary to the great weight of the evidence. Central installed the heating and air conditioning in the Jones home. Nelson Free, a partner in Central, testified:
 "Q. Did anyone come by at any point and ask you to complete the work?
"A. Yes, sir.
"Q. Who came by? *Page 13 
"A. Mr. Jones came by my office.
"Q. And when did this occur?
 "A. It was several — if I may elaborate, Mr. Jones at the time was a police officer and on patrol he would stop by the office several times. Or he had stopped by several times to ask us to complete the air-conditioning at his house.
 "Q. And what was your response to Mr. Jones's request?
"A. We refused to at the first instance.
 "Q. When you say first instance, on how many instances are we talking about?
 "A. If memory serves, I believe it was three or four times he stopped by the office.
 "Q. Were there any subsequent instances to the four or five times that he did come buy and ask you and you did refuse?
"A. I don't follow you.
 "Q. What if anything caused you to go out on the job site again?
"A. What refused us to?
 "Q. What if anything caused you to go out on the job site again?
"A. I'm sorry, I couldn't understand you.
 "Q. Following the times that Mr. Jones came by your office and you testified that you refused to go back out and complete the work, what if anything happened to make you change your mind?
 "A. Oh, okay. Mr. Jones as I said had come by and he asked that we finish the air-conditioning work. And if I remember I told him that we had heard from other subs that Mr. Hargrove was not paying the bills. And so he said that he wanted to know how much was left owing us and so I told him. And he said well if you'll finish I'll pay you.
"Q. Now, were those his exact words?
 "A. To the best of my knowledge. He said if Mr. Hargrove doesn't pay you I'll pay you if you'll finish it.
 "Q. On that basis did you enter in to the premises again and perform services?
"A. Yes, sir.
". . . .
 "Q. What is the amount of the indebtedness that you've claimed is owed you by virtue of this work which you filed in small claims and appealed here?
"A. I believe it is $587."
This evidence is sufficient to support a finding by the trial court in favor of Central and against the Joneses on the count for work and labor done.
To summarize, the judgments in favor of Tillery, Brown, Central, Rawls, and Henry against the Joneses are affirmed. The judgments against the Federal Land Bank of New Orleans in favor of Henry, Brown, Rawls, and the Joneses are reversed, except that the judgment requiring the Bank to account to the Joneses for interest charged on the sum interpleaded is affirmed. The judgment requiring the Bank to pay attorney's fees out of the interpleaded funds is reversed and the cause remanded for the trial court to determine to whom the interpleaded funds should be paid. Accordingly, the judgments are affirmed in part, reversed in part, and the cause remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur. *Page 14