This action comes before this Court on consolidated appeals involving alleged fraud in the sale of a life insurance policy insuring the life of Jane Simmons, plaintiff's deceased wife. The jury returned a verdict against the defendants, General American Life Insurance Company ("General American"), Land 
Associates, Inc., and Willie Foster, in the amount of $2.5 million dollars, which was remitted by the trial judge to $600,000. We affirm in part, reverse in part, and remand.
On May 7, 1986, Willie Foster, while visiting his brother at work, met with the plaintiff, Brad Simmons, to discuss burial insurance for his wife. Foster operated Foster Insurance Agency and was licensed to sell life and health insurance policies for several companies. Foster told Simmons that he could not provide a policy for burial insurance, but that he could offer a $10,000 policy with General American, and that the proceeds could provide funds for burial expenses.
Foster told Simmons what the amount of the annual premium would be and gave him an application for his wife to complete and sign. Simmons left the application in his *Page 142 
briefcase and did not return it to Foster until May 30, 1986.
At the time Simmons returned the application, he gave Foster an annual premium. Foster looked at the application for completeness, but did not give it much attention in detail. Simmons also received a "conditional receipt and interim insurance application," which specified the conditions under which interim insurance was afforded. Simmons admitted that he did not read that application.
Foster also told Simmons that his wife would be required to undergo a medical examination. Simmons contends that after paying the premium he asked Foster at what point his wife would be insured. Foster allegedly replied, "Just as soon as I get that check, if it's any good."
After receiving the material from Simmons, Foster delivered the application and annual premium to Land Associates. Land Associates served as a geographical brokerage agency for General American. Land Associates, in turn, forwarded the application and annual premium to General American's home office.
A medical examination was later performed in the Simmons home by a nurse, who met with Jane Simmons. General American then wrote to Jane Simmons's primary physician and requested her medical records. These records were not received until July 10, 1986.
On July 4, 1986, Jane Simmons died of a massive heart attack. Brad Simmons notified Foster of his wife's death, and Foster in turn notified Land Associates. Land Associates apprised General American of Mrs. Simmons's death on July 7.
On July 10, 1986, General American received the medical records from Mrs. Simmons's primary physician. On July 15, 1986, the underwriting department of General American made its formal decision that Jane Simmons had not been a "standard risk" when she applied for insurance coverage.
Although General American claimed that Jane Simmons had made numerous misrepresentations on her application, it did not deny coverage for that reason. General American claimed that the determination that Jane Simmons was not a "standard risk" was made due to her history of peptic ulcer disease, drug abuse and dependency, and abnormal EKG's indicative of ischemia or heart disease.
On August 21, 1986, Simmons sued General American and Willie Foster, alleging breach of contract, bad faith, and fraud. Simmons later amended his complaint to add Land Associates as a defendant. The trial court entered summary judgment in favor of the defendants as to Simmons's claim for bad faith, and the case proceeded to trial on the remaining claims for breach of contract and fraud.
The jury returned a verdict against all the defendants and assessed damages in the amount of $2.5 million. The defendants timely filed motions for a new trial, judgment notwithstanding the verdict, and remittitur. One of the grounds for defendants' motion for new trial was that during voir dire three jurors had failed to disclose that they had been parties to previous litigation.
After submission of briefs and argument, the trial court denied the motions for new trial, conditioned upon Simmons's acceptance of a remittitur of damages in the amount of $1.9 million. Simmons filed an acceptance of the trial court's remittitur within the time prescribed by the court's order. General American, Land Associates, and Foster appealed; Simmons cross-appealed as to the trial court's remittitur of damages.
The parties raise several issues for our review on appeal. We have consolidated several of the issues for clarity.
 I.
Simmons has conceded that Foster had no actual or apparent authority as an agent, but argues that General American and Land Associates are liable under the doctrine of respondeat superior. Therefore, the threshold question to be determined at this point is whether Foster made the allegedly fraudulent statement — that coverage would be effective as soon as *Page 143 
he received a check for the premium — while acting within the line and scope of his employment. This theory of liability depends not only upon the status of Foster, but also upon the status of Land Associates.
In National States Insurance Co. v. Jones, 393 So.2d 1361
(Ala. 1980), we stated:
 " 'As we see it, the extent of the authority of . . . [the] agent to bind [the corporate] appellant in contract is not necessarily conclusive in proof of liability of appellant in tort. The liability of a corporation for the torts of its employees, whether agent or servant, is grounded upon the principle of "respondeat superior" not the principles of agency. 3 Am.Jur.2d, Agency, § 267. The factual question to be determined is whether or not the act complained of was done, either by agent or servant, while acting within the line and scope of his employment. The corporation or principal may be liable in tort for the acts of its servants or agents, done within the scope of employment, real or apparent, even though it did not authorize or ratify such acts or even expressly forbade them.' "
393 So.2d at 1367 (citations omitted) (quoting Old SouthernLife Insurance Co. v. McConnell, 52 Ala. App. 589,296 So.2d 183, 186 (1974)).
The contract between General American and Land Associates was headed "Corporate General Agent's Contract." However, the body of the contract provided in part:
 "The General Agent shall have no power with respect to any contract to which the Company is, or purports to be a party, to make, alter or discharge such contract, or to waive any forfeiture or the performance of any of the terms or conditions of such contract."
The contract between General American and Foster was headed "Producer Agent's Contract." However, the body of the contract provided in part:
"Appointment
 "Subject to all the terms and conditions of this contract, the General Agent [Land Associates] does hereby appoint the Agent for the purpose of procuring in person applications for all forms of Individual Life insurance, Fixed Annuities and Health Insurance listed in the applicable Schedule(s) appearing in the Company's [i.e., General American's] Agent's Contract Manual, hereinafter referred to as Manual, and offered by the Company, which the Agent is properly licensed to sell.
"Agent's Status
 "None of the terms of this contract shall be deemed to create the relation of employer and employee between the General Agent and the Agent or between the Company and either the Agent or the General Agent; or to interfere with the freedom of the Agent's action as to the manner, time or place in which he conducts his business.
"Modification of Contracts: Compliance with Law
 "The Agent shall have no power with respect to any contract to which the Company is, or purports to be a party, to make, alter or discharge such contract, or to waive any forfeiture or the performance of any of the terms or conditions of such contract. The Agent shall comply with all laws and regulations in effect within said territory relating to the business of insurance."
In Washington National Insurance Co. v. Strickland,491 So.2d 872 (Ala. 1985), Justice Houston, writing for the majority, set forth a discussion of the distinctions between brokers, agents, and soliciting agents:
 "A 'general agent' is one who has authority to transact all of the business of the principal, of a particular kind or in a particular case. Southern States Fire Insurance Co. v. Kronenberg, 199 Ala. 164, 170-71, 74 So. 63, 67 (1917). The powers of such an agent are coextensive with the business entrusted to his care, authorizing him to act for the principal in all matters coming within the usual and ordinary scope and character of such business. Id., 199 Ala. at 171, 74 So. at 67. A general agent has full power to bind the insurer to the agent's contract of insurance or to issue policies or to *Page 144 
accept risks. McGhee v. Paramount Life Insurance Co., 385 So.2d 969 (Ala. 1980). In fact, a general agent 'stands in the shoes' of the principal for the purpose of transacting business entrusted to him. Since a general agent's powers are coextensive with the business entrusted to him, his fraudulent act is the fraudulent act of his insurer principal as well.
 "An insurance company also has the right to employ agents with limited authority. Robinson v. Aetna Insurance Co., 128 Ala. 477, 30 So. 665
(1901). A 'special agent' as distinguished from a 'general agent,' is authorized to act for the principal only in a particular transaction, or in a particular way. Southern States Fire Insurance Co., supra, 199 Ala. at 171, 74 So. 63. In the insurance context, the most prevalent type of special agent is the 'soliciting agent.' A soliciting agent is different from a general agent in that he has no power to bind his insurer principal in contract. Watson v. Prudential Insurance Co., 399 So.2d 285
(Ala. 1981). However, when a soliciting agent commits a fraud upon one who seeks insurance coverage, his insurer principal will be liable for that fraud, if the fraud was perpetrated by the agent within the scope of his employment. The liability of an insurer for the fraudulent acts of its soliciting agents is grounded in the doctrine of 'respondeat superior,' and not the doctrine of agency. National States Insurance Co. v. Jones, 393 So.2d 1361 (Ala. 1980). Since a soliciting agent is regarded as the 'servant' of the insurer 'master,' the insurer has the full right of control over the agent's actions. A general agent, however, stands in the shoes of the principal; his actions are regarded as those of the principal. The law deems the principal to have 'participated' in the fraud of its general agent, and so subjects the principal to direct liability. Where a soliciting agent commits fraud the insurer's liability is vicarious, and the principal is liable in spite of the fact that he did not participate in the fraud, or even forbade it. National States Insurance Co. v. Jones, supra, at 1367.
 "An independent agent or broker is usually not an agent for the insurer at all; rather, he is the agent of the insured. See Code 1975, § 27-7-1. For example, this Court has held that when an independent agent or broker fails in his duty to obtain insurance coverage, the principal may sue either for a breach of contract, or, in tort, for breach of duty imposed on the agent or broker to [use] reasonable skill, care, and diligence in obtaining insurance. Highlands Underwriters Insurance Co. v. Elegante Inns, 361 So.2d 1060
(Ala. 1978). In Highlands, the principal was the insured."
491 So.2d at 874-75 (emphasis added).
Simmons contends that Foster was the soliciting agent for both General American and Land Associates. Land Associates and General American argue that Foster was an independent agent, and that the doctrine of respondeat superior does not apply because they did not exert sufficient control over the activities of Foster.
"The test to be applied in determining the existence of an agency relationship under the doctrine of respondent superior is whether the alleged principal reserved a right of control over the manner of the alleged agent's performance. However, the right to determine if an alleged agent is conforming to the requirements of a contract does not, in itself, establish control." Carlton v. Alabama Dairy Queen, Inc., 529 So.2d 921,923 (Ala. 1988); Wood v. Shell Oil Co., 495 So.2d 1034, 1036
(Ala. 1986); Williams v. Tennessee River Pulp Paper Co.,442 So.2d 20 (Ala. 1983). Furthermore, agency is not determined by how the parties characterize their relationship, but by the facts of each case. Brown v. Commercial Dispatch PublishingCo., 504 So.2d 245 (Ala. 1987); Federal Land Bank of New Orleansv. Jones, 456 So.2d 1 (Ala. 1984).
The evidence at trial revealed that Land Associates was a geographical brokerage agency for General American. While the contract between General American and Land Associates referred to Land Associates *Page 145 
as a general agent, Ed Land, president of Land Associates, testified that that company merely acted as a paper clearinghouse between agents and General American and that Land Associates had no decisionmaking power with regard to the underwriting or acceptance of General American's policies.
Land testified that when Foster initially requested to sell General American policies, he conducted an investigation into Foster's background and forwarded the information resulting from that investigation to General American. It was General American, and not Land, he said, who decided to issue Foster a contract to sell General American's policies.
Foster testified that he was licensed to sell life and health insurance policies through many companies, including General American. Foster received a manual from General American outlining the company's policies, and that manual was made part of his contract. Foster stated that when he sold a policy it was General American, not Land Associates, who paid him.
General American had the authority to hire and fire its agents, to determine the methods by which they were trained, to issue its company training manuals, and to pay its agents their commissions. There is sufficient evidence in the record to support the jury verdict under the theory of respondeat superior in favor of Simmons against General American.
However, that result also compels us to conclude that there was insufficient evidence to support the jury verdict against Land Associates. There was no evidence that Land Associates served as anything other than a geographical brokerage agency for General American, or that Land Associates exercised any control over Foster or functioned as anything more than a paper clearinghouse between General American and its soliciting agents.
 II.
The defendants contend that Simmons failed to show that he had justifiably relied on the misrepresentations of Foster. Simmons admitted that he did not read the terms of the interim insurance application, but, instead, claimed to have relied upon Foster's assurance that his wife was covered immediately, provided his check "was good."
This Court has recently stated that reliance should be assessed by the following standard:
 "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is 'one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.' "
Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), quotingSouthern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1092
(Ala. 1989) (Hornsby, C.J., concurring specially). See alsoGrimes v. Liberty National Life Insurance Co., 551 So.2d 329
(Ala. 1989).
Simmons contends that, under the facts of this case, he was justified in relying on Foster's statement that his wife was covered because even if he had read the interim insurance application, he would not have been put on notice that Foster's representations were false. We agree.
The "conditional receipt and interim insurance application" provided:
"CONDITIONS PRECEDENT
". . . .
 "(6) Our underwriters must formally determine that on the latest of:
"(a) the date of the Application Part I, or
 "(b) the date of the latest Application Part II, or
 "(c) the date of the latest medical examination or test we require, each proposed insured was acceptable to us under our rules, limits and standards. Each person must qualify for the exact plan and amount of insurance and for all supplemental riders applied for. Each person must also be insurable at least at our standard premium rates. *Page 146 
 "(7) No interim insurance will be in effect if any incorrect or untrue or incomplete statement of material fact is made on:
"(a) the Application Part I or Part II, or
 "(b) any report of any examination or medical test submitted to us.
". . . .
"TERMINATION OF INTERIM INSURANCE
 "Interim insurance shall terminate automatically without notice to anyone on the earliest of the following dates:
 "(1) The date we formally approve the exact policy(ies) applied for.
 "(2) The date we determine that you do not qualify as a standard risk and elect to terminate the interim insurance.
"(3) The date we formally approve a policy:
"(a) on a different plan;
"(b) for a different amount;
"(c) with different benefit riders;
"(d) at a special risk classification; or
"(e) with any exclusion or impairment rider(s).
 "(4) The date we formally determine not to offer any policy.
 "(5) The beginning of the 90th day after the date of this Receipt." (Emphasis added.)
An annotation has explained the reasoning for these clauses as follows:
 "Since, in the absence of a specific agreement, the payment of the first premium and the delivery of the policy are concurrent acts, a period intervenes between the signing of the application by the applicant and the delivery of the policy. During this period no money has been advanced to the insurance company, and no insurance is in effect. This interval, of a few days to several weeks, depending upon the time consumed in investigation and physical examination of the applicant, in passing upon his application at the home office, is highly undesirable from the point of view of the insurer as well as of the applicant. The disadvantage to the applicant consists in the fact that he is not covered by insurance during this period, while the disadvantage to the insurer consists in the fact that during this period the applicant possesses the power to revoke the offer made in his application. This disadvantage is a very real one as far as the insurer is concerned, since if the applicant decides to exercise his power, either because he chooses not to carry any insurance at all, or because he chooses to purchase it of a rival company, the company suffers a loss of what it has expended for the investigation and medical examination for the applicant, aside from the loss of business itself.
 "To obtain some measure of protection against the applicant's arbitrary withdrawal of his offer during the company's extensive investigation of his insurability, the insurance companies have hit upon the idea of issuing so-called binding receipts to the applicant upon the payment of the first premium. These binding receipts, or conditional binding receipts, as these instruments are sometimes, though less frequently, called, usually contain a provision which, in some instances, is duplicated in the application itself, to the effect that the insurance shall be considered as in force from the date of the receipt, or the date of the medical examination, provided the application is approved and accepted at the home office of the insurer. Sometimes the date of approval or of issuance of the policy is chosen as the date the policy shall become effective, and in some instances no condition is imposed upon the applicant. The exact language of these provisions varies greatly.
 "The issuance of these binding receipts effectively does away with the disadvantage threatening the insurer. They protect it in two ways: The applicant to whom the binding receipt is issued feels, as a rule, contractually obliged to perform and, should he withdraw his application, he is unlikely to resort to a lawsuit to recover the relatively small sum paid. In addition to achieving this primary object, the issuance of a binding receipt has the incidental advantage for *Page 147 
the insurer that it serves to give the insurer the use of the premium money at the earliest possible date and that it offers a selling point of which no agent fails to make the utmost in his talks with prospective customers."
Annotation, Temporary Life, Accident, or Health InsurancePending Approval of Application or Issuance of Policy, 2 A.L.R.2d 943 (1948) (footnotes omitted). See also Powell v.Republic National Life Insurance Co., 337 So.2d 1291
(Ala. 1976); R. Keeton A. Widiss, Insurance Law (1988).
We think Simmons might have understood the phrase "[i]nterim insurance shall terminate automatically without notice to anyone . . . on [t]he date we determine that you do not qualify as a standard risk and elect to terminate the interim insurance" to mean that his wife was receiving temporary coverage that would terminate on the day she might be determined not to be a "standard risk," should such a determination be made. That clause, when coupled with the conditional language in the "conditional receipt and interim insurance application" is not entirely clear.
In light of the foregoing, we find that the issue of whether Simmons justifiably relied on the misrepresentations of Foster was properly submitted to the jury. Liberty National LifeInsurance Co. v. Sherrill, 551 So.2d 272 (Ala. 1989).
 III.
The defendants contend that the trial court abused its discretion when it failed to grant a new trial on the grounds that three members of the jury panel who were eventually selected as jurors failed to disclose on voir dire that they had been involved in previous litigation. During voir dire, the venire was asked the following question by counsel:
 "Are any of you on the panel or any member of your immediate family ever been either a plaintiff — that is a claimant bringing a suit — or a defendant — that is a person against whom a suit is brought? Anybody fall in that category?"
In response to the question, one prospective juror responded that her former son-in-law had been a defendant in a criminal action, and another prospective juror answered that she and her husband had been involved in a breach of contract case.
After the trial, an investigation revealed that three of the jurors had been involved in events that called for an affirmative response. One of the jurors, Lucy Andrews, failed to disclose that in 1984 she sued an individual for personal injuries and property damage arising out of an automobile accident.
Another juror, Ronald Brockman, failed to disclose that he and his wife had been defendants in an action in district court on a promissory note brought by a finance company. The proceeding had been stayed when Mr. Brockman and his wife filed a petition for bankruptcy.
Finally, a third juror, Michael Howard, failed to disclose that he had been sued in district court in a subrogation action brought by an insurer arising out of an automobile accident in 1985. A default judgment was entered against him in that action, and his wages were garnished to satisfy the judgment.
In regard to this issue, the trial court stated in its order denying the defendants' motion for new trial:
 "With respect to the former, the defendant General American has filed original and amended motions establishing that three persons eventually seated as jurors did not fully answer, or did not make any response to, certain voir dire questions. General American requested that these jurors be summoned to an evidentiary hearing. The Court has considered the matters contained in and the materials submitted with General American's motions and finds 'substantial temporal remoteness of the previous litigation to the present case, inadvertence on the part of these venire persons, or a misunderstanding — at least on their part — of the questions as they related to them personally.' Ensor v. Wilson, 519 So.2d 1244
(Ala. 1987). *Page 148 
 "Jurors make substantial sacrifices to perform their duty, and the Court is not disposed to further impose on them where, as here, there has been no showing of probable prejudice. Therefore, General American's motion to have the jurors summoned to court and examined is denied. Plaintiff has filed affidavits of these jurors. The Court does not condone the taking of these statements, has not considered them in connection with the instant motions and grants General American's motion to strike them."
The general rule is that in the trial of a case, the parties have a right to have their questions on voir dire answered truthfully, so as to enable them to exercise their discretion wisely in the use of their peremptory strikes. Sanders v.Scarvey, 284 Ala. 215, 224 So.2d 247 (1969). The scope of review by this Court was stated in Freeman v. Hall, 286 Ala. 161,166-67, 238 So.2d 330, 335-36 (1970):
 "We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant. This appears to be the general rule throughout the country [see Annotations, 38 A.L.R.2d 624, and 63 A.L.R.2d 1061]. In Leach v. State, 31 Ala. App. 390, 18 So.2d 285 (1944), the then Court of Appeals said:
 " ' "* * * the fact that a juror answered falsely as to his qualifications is a recognized ground for a new trial" * * * — we would say, of course where there was probable prejudice to the defendant by such juror's conduct. * * *' [Emphasis supplied.]
 "There is broad support for the proposition that the trial court's application of the probable prejudice test is subject to review only for abuse of discretion. See Annotation, Effect of juror's false or erroneous answer on voir dire as to previous claims or actions against himself or his family, 63 A.L.R.2d 1061, 1063, where it is said:
 " 'It has been recognized by those courts considering the question that whether or not the complaining party is or may have been prejudiced by the juror's failure to answer properly the question addressed to him is a matter primarily for the trial court's discretion any [sic] power, not subject to reversal unless abused.'
"In Peterson v. Skiles, 173 Neb. 470, 113 N.W.2d 628, 636-637
(1962), the Supreme Court of Nebraska held, in a similar fact situation to the case at bar:
 " '* * * [T]he question as to whether or not the complaining party was prejudiced by the juror's failure to answer properly is a matter primarily within the discretion of the trial court. In the absence of a showing of an abuse of discretion the ruling of the trial court thereon will not be reversed. * * *'
"See also Beggs v. Universal C.I.T. Credit Corporation,387 S.W.2d 499 (Mo. 1965); Pearson v. Gardner Cartage Co., 148 Ohio St. 425, 76 N.E.2d 67 (1947), (Syllabus 2).
"This rule comports with logic and common sense. The trial judge heard the questions posed on voir dire and answers thereto. He is in the best position to make findings on the question of probable prejudice after the testimony is developed orally, or by affidavit, or new trial motion. His conclusions are then subject to our review for abuse of discretion.
"We said in Morris v. Zac Smith Stationery Co., 274 Ala. 467,470 149 So.2d 810, 813 [1963]:
 " 'The trial judge was present in court when the voir dire examinations took place; he was in position to observe the lawyers for both parties during their respective questions to the jurors on voir dire; he heard the tone of their voices and the time given between the questions that elicited answers from the jurors. The clarity of the questions propounded was also addressed to his judgment.' " *Page 149 
See also Ensor v. Wilson, 519 So.2d 1244, 1263 (Ala. 1988); GoldKist, Inc. v. Brown, 495 So.2d 540 (Ala. 1986).
The trial court is in the best position to determine whether there was probable prejudice as a result of a juror's failure to respond to questions during voir dire. Because of the phrasing of the question asked during voir dire, it is understandable that the cause of the failure to respond was merely a misunderstanding on the part of the jurors. Under the facts of this case, we cannot say that the trial court abused its discretion in not granting the new trial for the failure of the three members of the jury panel to respond to the question addressed to them on voir dire.
 IV.
The defendants next contest the punitive damages aspect of the case. The defendants argue that the punitive damages award in this case is unconstitutional and violates the fifth, eighth and fourteenth amendments to the United States Constitution and Article 1, § 6, of the Alabama Constitution.[1]
The Supreme Court of the United States has recently held inBrowning-Ferris Industries of Vermont, Inc. v. Kelco Disposal,Inc., ___ U.S. ___, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), that the excessive fines clause of the eighth amendment does not apply to punitive damages awards in cases between private parties. Furthermore, this Court has consistently rejected the same arguments made by these defendants and has upheld the constitutionality of punitive damages. See Pacific Mutual LifeInsurance Co. v. Haslip, 553 So.2d 537 (Ala. 1989);HealthAmerica v. Menton, 551 So.2d 235 (Ala. 1989); Olympia Spav. Johnson, 547 So.2d 80 (Ala. 1989); Industrial Chemical Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala. 1989);United American Insurance Co. v. Brumley, 542 So.2d 1231
(Ala. 1989).
Furthermore, this Court has adopted guidelines to be used by the trial court in reviewing punitive damages awards. These guidelines are found in Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986); Harmon v. Motors Insurance Corp.,493 So.2d 1370 (Ala. 1986); Alabama Farm Bureau Mutual Casualty InsuranceCo. v. Griffin, 493 So.2d 1379 (Ala. 1986); and Green Oil Co. v.Hornsby, 539 So.2d 218 (Ala. 1989).
Defendants argue that even though the trial court granted a remittitur in this case of $1.9 million, the amount of the verdict remains clearly excessive. We disagree.
The trial court entered an opinion according to the guidelines of the above cases. We agree that there was sufficient evidence to uphold an award of punitive damages in this case.
Finally, Simmons argues in his cross-appeal that the trial court erred in remitting the jury verdict to $600,000, and that the original jury verdict of $2.5 million should be reinstated. Simmons contends that the trial court erred in remitting the jury's verdict, because, he says, the judge remitted it simply because he felt that the jury awarded too much.
The trial judge entered an opinion wherein he complied with the guidelines of Hammond v. City of Gadsden, 493 So.2d 1374
(Ala. 1986). The trial court's order stated in part:
 "Punitive damages cannot be excessive as a matter of law. The question here, then, is whether the award is the result of 'bias, passion, corruption, or other improper motive' on the part of the jurors. The Court will immediately reject bias and corruption, leaving passion or other improper motive. One of the defendants suggests passion, citing the fact that several jurors wept and hugged plaintiff after rendition of their verdict. However, this could as readily reflect sympathy for the manner in which plaintiff was treated on the stand as a passion to give *Page 150 
him excessive amounts of defendants' money.
 "The problem here is that $2,500,000 is simply too much for the conduct of which defendants were guilty. The Supreme Court has said that if the amount of a verdict is greatly out of line, 'it is fair to infer, in the absence of extraordinary features, that some improper motive has led the jury astray.' Alabama Power Co. v. Smith, 273 Ala. 599
[509], 142 So.2d 228 (1962). The court makes that inference, recognizing full well that such improper motive is not 'established and reflected in the record,' as apparently required by Hammond.
 "In any event, after careful and thoughtful consideration, taking into account the gravity of the wrong, the nature and extent of the injury inflicted upon plaintiff, and upon making comparative analysis with other awards in similar cases, defendants' motions for a new trial or other relief are denied on the condition that plaintiff file with this court within 14 days a remittitur of damages in the sum of $1,900,000; otherwise, the motions will be granted."
We agree that the trial judge erred when he stated that the verdict was "simply too much for the conduct of which defendants were guilty." See Western Super Markets, Inc. v.Keith, 528 So.2d 317 (Ala. 1988); Stinson v. Acme Propane GasCo., 391 So.2d 659 (Ala. 1980); B M Homes, Inc. v. Hogan,376 So.2d 667 (Ala. 1979). That error, however, was harmless, in light of the remainder of the trial court's order.
In Green Oil Co. v. Hornsby, supra, this court stated the following with regard to the trial court's remittitur and punitive damages:
 "What amount is sufficient to punish [the defendant] and to deter it, and others similarly situated, from committing similar acts in the future? Traditionally, the jury has been afforded a great deal of discretion in assessing punitive damages. Roberson v. Ammons, [477 So.2d 957
(Ala. 1985)]. The exercise of that discretion is, of course, subject to judicial review to insure that it is not the result of bias, passion, prejudice, corruption, or other improper motive. City Bank of Alabama v. Eskridge, [521 So.2d 931 (Ala. 1988)]. The trial court in the case at issue found that the verdicts were in no way affected by bias, passion, prejudice, corruption, or other improper motive or conduct. This Court has recognized, however, that even though a jury verdict may not be excessive because it is the result of an improperly functioning jury, it is possible for a verdict to be excessive even when it is the result of a properly functioning jury. See City Bank of Alabama v. Eskridge, supra. For example, in assessing punitive damages, the jury is not allowed to consider the financial position of the defendant, Southern Life Health Ins. Co. v. Whitman, 358 So.2d 1025 (Ala. 1978). The defendant's financial position is, however, a consideration essential to a post-judgment critique of a punitive damages award. City Bank of Alabama v. Eskridge, supra; see, also, Hammond v. City of Gadsden, [493 So.2d 1374 (Ala. 1986)]. Bearing in mind that punitive damages must not exceed an amount that will accomplish society's goals of punishment and deterrence, it is possible for a jury to hear the evidence in the case, make findings of fact, correctly apply the law, and still, albeit unwittingly, assess damages that bear no reasonable relationship to the accomplishment of those goals."
539 So.2d at 222 (emphasis added).
Moreover, damages are considered excessive if they "shock the judicial conscience of the court." Southern Life HealthInsurance Co. v. Smith, 518 So.2d 77 (Ala. 1987); Village ToyotaCo. v. Stewart, 433 So.2d 1150, 1155 (Ala. 1983); U-Haul Co. ofAlabama v. Long, 382 So.2d 545 (Ala. 1980).
While the trial court stated that the verdict was not the result of bias, prejudice, or other improper motive, the judge did consider the gravity of the wrong and the nature and extent of the injury inflicted upon the plaintiff and made a comparative analysis with other awards in similar cases as required by Green Oil. Therefore, *Page 151 
based on the foregoing, we cannot say that the trial court erred in ordering the remittitur.
87-1313 REVERSED AND REMANDED.
87-1320 AFFIRMED.
87-1331 AFFIRMED.
87-1339 AFFIRMED.
HORNSBY, C.J., and MADDOX, JONES and SHORES, JJ., concur.
HOUSTON, J., concurs as to parts I and II; concurs specially as to part III; and concurs in the result as to part IV.
STEAGALL, J., concurs in part and dissents in part.
[1] The defendants also contend that the trial court erred in charging the jury that punitive damages could be awarded without a finding that the defendants intended to defraud or deceive the plaintiff. We need not reach this issue concerning the trial court's jury instruction, because it was not properly preserved for review pursuant to Rule 51, A.R.Civ.P.