258 So.2d 882

**UNION OIL COMPANY OF CALIFORNIA, a California Corporation, et al.**

v.

**Clyde Huey CRANE.**

**UNION OIL COMPANY OF CALIFORNIA, a California Corporation, et al.**

v.

**John Paul CRANE.**

**5 Div. 909, 5 Div. 909–A.**

Supreme Court of Alabama.

Feb. 24, 1972.

Rehearing Denied March 23, 1972.

Hill, Hill, Stovall, Carter & Franco and Harry Cole, Montgomery, William O. Walton, Jr., Lafayette, for appellant Union Oil Company of California, J. A. Hines, Lafayette, for appellant Floyd Britt.

Samford, Torbert, Denson & Horsley, Opelika, Hubert Benson, Lanett, for appellees.

**HEFLIN, Chief Justice.**

This is an appeal from verdicts and judgments rendered in the consolidated suits of Clyde Huey Crane and his father, John Paul Crane, against Union Oil Company of California, a California corporation, and Floyd Britt, doing business as Britt's Pure Oil Service Station, which said suits involved personal injuries sustained by the son and derivative damages to the father.

The complaints as originally filed named as defendants Jerri Sturkie; Floyd Britt, d/b/a Britt's Pure Oil Service Station; Pure Oil Corporation; Stadevco, Inc.; and numerous fictitious defendants. Union Oil Company of California was substituted by amendment in place of ABC, a fictitious defendant. A stipulation made at the begin-

ning of the trial and testimony developed at the trial indicated Stadevco, Inc., Union Oil Company of California, and Pure Oil Company were really one "in" the same corporation, and through amendments and dismissals the only corporate defendant at the conclusion of the trial was Union Oil Company of California, a California corporation, doing business as Pure Oil Company, and the only individual defendant remaining was Floyd Britt, doing business as Britt's Pure Oil Service Station.

Floyd Britt, on November 28, 1968, operated a Pure Oil Service Station in Langdale, Alabama. On that date the plaintiff, Clyde Huey Crane, was an invitee in the Britt station having work done on his brother's automobile. An automobile belonging to Miss Jerri Sturkie was driven into the station by a friend of Miss Sturkie, for the purpose of having a brake defect identified and corrected. Miss Sturkie was a passenger in the automobile at the time. After a preliminary examination revealed a leak in a brake line, Floyd Britt, at the request of Miss Sturkie, proceeded to drive the automobile onto a Joyce drive-on hydraulic lift located in a bay in the station building. Britt was unable to stop the automobile, whereupon the front wheels ran over the angled flanges on the back ends of the runners and the front end of the automobile struck the plaintiff, Clyde Huey Crane, breaking his leg.

There was testimony, though disputed, that Floyd Britt requested Clyde Crane to guide the automobile onto the lift. While Crane was standing in front of the lift guiding it on, Mr. Britt drove the Sturkie automobile onto the lift but was unable to stop it when the brakes did not work. Clyde Crane testified that Miss Sturkie asked Mr. Britt to drive the car upon the rack (lift) and to be real careful, whereupon, Mr. Britt responded that he thought there was enough brake fluid to stop it. There was disputed testimony that as Britt approached the rack, the automobile was not going fast enough to drive onto it and Britt allowed it to roll back and then "kinda scratched off and the car jumped

upon the rack." When Britt applied the brakes, the auto would not stop and it hit Clyde Crane, pinning him between a table and the front of the car. Britt admitted it was dangerous to drive the car upon the ramp of the lift in the automobile's condition. Cylde Crane testified that Britt admitted to him that he (Britt) was at fault and should not have asked Crane to help him guide the auto upon the lift. Mr. Britt denied he ever made such admissions to Clyde Crane.

Union Oil Company contends that its request for the affirmative charge should have been granted and that the motion for a new trial should also have been granted because the evidence in the cases failed to meet the respective requirements of law pertaining to the allowance of a jury determination in the case.

On the other hand, the appellees argue that the case was properly submitted to the jury because of the duty of the owner (Union Oil Company) of the premises or the duty of the landlord (Union Oil Company) to invitees on the premises to maintain the hydraulic lift in a safe condition where the owner or landlord retains the right of maintenance of the lift. In addition to these theories the appellees further argue that the case was properly submitted to the jury since from the evidence in the case the jury could have imposed liability on Union Oil Company through the principle of respondeat superior, if it found that an agency was created by estoppel.

It was admitted by the appellees at the trial that there was probably no evidence of a latent defect in the lift and the trial judge charged out the causes of action dependent upon proof of a latent defect. Therefore under the posture of this case on appeal it is not necessary to consider those counts of the complaint which charged Union Oil Company with a duty based upon latent defects of the hydraulic lift.

All of the other alleged causes of action pertaining to the duty of an owner or of a

landlord contained allegations that the lift was imminently or inherently dangerous. A consideration of whether the evidence presented a jury question as to whether the hydraulic lift was imminently or inherently dangerous is necessary. First, it is important to understand that the drive-on hydraulic lift at the time the automobile ran off of it was not up in the air. It was on the floor. Its elevating mechanism had not been activated. The pertinent portions of the hydraulic lift were two metal runners "wide enough" for the front and back wheels on one side of the car to rest upon that runner, and for the front and back wheels on the other side of the car to rest upon the other runner. At the entrance point of each runner there was a portion of it designed in a ramp fashion to allow the wheels of a motor vehicle to run up on the runners. The elevation of the runners before receiving hydraulic lifting was approximately four (4) inches above the floor. The bottom of the tires of the Ford automobile on the occasion of the accident would have also been approximately four (4) inches above the floor when the automobile was on the lift. At the opposite end of the lift from the entrance end on each runner, there was an angled flange which was approximately eight (8) inches wide and which extended approximately five (5) inches above the runner. The purpose of the flanges was to prevent an automobile from rolling off that end when the lift was elevated. The description of the angles of the flanges varied. Most of the testimony placed the angle at a 30-degree angle. An inspection of the photographs of the lift reveals that the angle of these flanges was approximately thirty degrees.

There was undisputed evidence that similar Joyce drive-on hydraulic lifts were in common use at the time of the accident. In fact there was undisputed testimony that more than 300 similar Joyce drive-on hydraulic lifts were being used in Alabama in Pure Oil (Union Oil) stations at the time of the collision.

The appellees contend that a newer type of lift, known as a rotary frame control lift, had been delivered to the Britt's Service Station premises approximately two weeks prior to the accident and that such newer lift remained there for three or four months after the accident before it was installed. The appellees also contend that a jury issue was made because Mr. Britt testified that the new rotary frame contact lift was safer and better engineered than the Joyce drive-on hydraulic lift. However, we are persuaded that such evidence is insufficient to make a jury issue concerning whether the Joyce drive-on hydraulic lift was imminently or inherently dangerous.

For discussion of imminent and inherently dangerous instrumentalities, see Defore v. Bourjois, Inc., 268 Ala. 228, 105 So.2d 846 and Harnischfeger Corporation v. Harris, 280 Ala. 93, 190 So.2d 286.

■ The crux of the inquiry is to determine whether or not the angled flanges of the hydraulic lift were designed so that the owner or the landlord knew, or should have known, that the accident in question would occur. It is this Court's opinion that the design of the angled flanges was not such that the injury should have been reasonably anticipated (See: Sears, Roebuck & Co. v. Morris, 273 Ala. 218, 222, 136 So.2d 883), or the danger of injury could reasonably be expected (See Greyhound Corporation v. Brown, 269 Ala. 520, 526, 113 So.2d 916), or that Union Oil "had a probable knowledge of danger, or that the nature of the thing would probably cause injury or that it was reasonably certain to place life and limb in peril" (See Defore v. Bourjois, Inc., 268 Ala. 228, 233, 105 So.2d 846, 851).

■ Next, this Court directs its attention to whether or not the evidence in this case justified the submission to the jury of the issue of whether Union Oil Company was liable for the acts of Floyd Britt in driving the automobile on this occasion and allowing it to strike Clyde Huey Crane. Under the theory that the doctrine of re-

spondeat superior was brought into play by estoppel, the appellees contend that the following facts were sufficient to create a master-servant relationship between Floyd Britt and Union Oil Company by estoppel.

Mr. Britt signed a lease with Pure Oil Company in April of 1959 and continued to operate the station from that date through the time of the accident. Clyde Crane had traded almost exclusively with this station for one and one-half years before the accident. Clyde Crane came on the premises strictly for business. The station had a large sign indicating it was a Pure Oil station, and another sign read "Britt's Pure Oil Station." The gas pumps had "Pure Firebird" and other symbols indicating it was a Pure Oil gas station. Pure Oil representatives were often at the station to deliver gas and for other purposes. Mr. Britt sold many products of Pure Oil, such as gas, oil, lubricants, grease and tires. Many of such products had Pure Oil's name and insignia on them. Clyde Crane testified he noticed at all times that these products were being sold and he, in fact purchased a cushion with a Pure Oil Symbol. Mr. Britt had worn a uniform at all times since 1957. Clyde Crane testified he noticed that at all times Mr. Britt always wore a Pure Oil uniform, which had markings on the cap and shirt advertising Pure Oil. The attendant, Leroy Lyon, occasionally wore a Pure Oil uniform.

The following general statement of the application of "agency by estoppel" theory appears in Pearson v. Agricultural Insurance Company, 247 Ala. 485, 488, 25 So.2d 164:

"While some suggestion has been made that a distinction exists between apparent authority and authority grounded on estoppel, 2 C.J.S. Agency § 96, p. 1208, our cases and authority generally base the two upon the same elements.

" ' "As between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent's authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny." '

" 'Such apparent authority is the real authority so far as affects the rights of a third party without knowledge or notice. * * *' Patterson v. Williams, 206 Ala. 527, 528, 91 So. 315.

" 'When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency. * * *' Halle v. Brooks, 209 Ala. 486, 487, 96 So. 341, 342.

" 'The apparent authority of the agent is the same, and is based upon the same elements as the authority created by the estoppel of the principal to deny the agent's authority; that is to say, the two are correlative, inasmuch as the principal is estopped to deny the authority of the agent because he has permitted the appearance of authority in the agent, thereby justifying the third party in relying upon the same as though it were the authority actually conferred upon the agent. This has been the view of practically all the cases on the point. * * *' 2 Am.Jur., p. 86, § 104."

The appellees contend that the case of Standard Oil Company v. Gentry, 241 Ala. 62, 1 So.2d 29 (1941) is controlling in this case. In that case the plaintiff, on June 18, 1939, slipped and fell at a service station in Montgomery. The plaintiff filed suit against Standard Oil Company which owned the station and a Mr. Young who operated the station, alleging that both of them operated and maintained the station. Prior to March 1, 1939, Standard Oil Company had operated the station, but on March 1, 1939, a lease contract was entered into between the company and Young, whereby Young was to operate the station for $25.00 per month and 1¢ per gallon of gasoline

sold. This lease was in effect at the time of the plaintiff's injury. Standard Oil Company occasionally inspected the premises. This Court declared in that case:

"Under these circumstances we would not be justified in the conclusion that this company was on the date of the plaintiff's injury operating and maintaining this station, as alleged in the complaint * * * But we are persuaded from the evidence in this case it was for the jury to determine whether or not the Standard Oil Company was estopped, so far as plaintiff was concerned, from claiming it was not operating and maintaining this station when his injuries were sustained * * * *." At 64, 1 So.2d 29, at 31.

In that case the plaintiff's testimony tended to show his reason for transferring his business was an unsatisfactory experience with an independent operator and desire to do business with a more responsible party. A Standard Oil sign exhibited to the public, a license in the office, both the telephone and city directories, and all other indications pointed to a continued operation of this station by the company. The Court found the plaintiff had no basis for knowing that there has been a change in the operation of the station. The plaintiff's evidence tended to show that he relied upon the apparent operation by the company in continuing to do business at the station.

Standard Oil Company v. Gentry, supra, relies upon the case of Augusta Friedman's Shop, Inc. v. Yeates, 216 Ala. 434, 113 So. 299. In that case, the plaintiff was injured when she went into a beauty salon and an employee of the shop negligently burned the plaintiff's scalp. The evidence indicated that the defendant was a corporation by the name of Augusta Friedman's Shop, Inc. but the operator of the salon was Augusta Friedman Beauty Salon, and that these were two different entities. The Court held the corporate defendant liable upon the theory of estoppel and affirmed a lower court verdict for the plaintiff. In this case the names were, in part, identical, the salon

was in the corporate defendant's building, was reached by its elevator and the defendant advertised it in connection with the general business and failed to designate anyone else as the owner or proprietor. Not only was this done, but the plaintiff, when settling her bill, made the check payable to "Augusta Friedman's Shop" and the check was endorsed and presumably collected by "Augusta Friedman's Shop, Inc." This Court, in that case, stated as follows:

"It is a well-established rule of law that, when one holds himself out as the owner or partner in a business, and third persons are thereby misled or injured, the person so holding himself out is liable to the same extent as if he was the owner or partner, although there may have been no proprietorship or partnership inter sese. Alabama Fertilizer Co. v. Reynolds, 85 Ala. [19] 23, 4 So. 639; Levy v. Alexander, 95 Ala. 101, 10 So. 394; Cain v. Standard Co., 108 Ala. [346,] 348, 18 So. 882. And this rule also applies as to principal and agent. 2 C.J. §§ 70, 71, p. 461; Mechem on Agency, §§ 83, 84; Gibson v. Snow [Hardware Co.], 94 Ala. 346, 10 So. 304; Southern R. R. v. Beaty, 212 Ala. 608, 103 So. 658. * * * *." At 434, 113 So. at 300.

The facts of the case at bar seem to be even stronger than the facts in Standard Oil Company v. Gentry, supra, pertaining to a holding out that this was the oil company station. However, it is clearly pointed out in Standard Oil Company v. Gentry, supra, that there must be a reliance on the part of the injured person before liability can be engrafted through the doctrine of respondeat superior, by estoppel, on the master. In Standard Oil Company v. Gentry, supra, there was strong evidence of reliance. Gentry's testimony tended to show that his reason for transferring his business was the desire to do business with a more responsible person than an independent operator. Prior to the change of entity status Gentry had relied upon the apparent operation by the company. Following the change of entity status, Gentry's testimony tended to show that he continued

to rely upon the apparent operation by the company. The following language appears in Standard Oil Company v. Gentry, supra:

"Of course plaintiff must have relied upon such representations by the company. Augusta Friedman's Shop v. Yeates, supra; Birmingham News Company v. Birmingham Printing Company, 209 Ala. 403, 96 So. 336; American Law Institute Restatement of the Law of Agency, Sections 265–267; Patterson v. Neal, 135 Ala. 477, 33 So. 39. * * * *" At 64, 1 So.2d at 31.

In Pattillo v. Tucker, 216 Ala. 572, 575, 113 So. 1, 3, this Court said:

"But it must also be borne in mind that a party who invokes an estoppel must have in good faith been ignorant of the true facts at the time the representation is made to him and at the time he acted thereon, and he must show that he acted with diligence to learn the truth. 2 Pom.Eq. (3d Ed.) § 810; 10 R.C.L. 696."

The following language appears in Birmingham News Company v. Birmingham Printing Company, 209 Ala. 403, 405, 96 So. 336, 339:

" 'Estoppel,' by holding out another as the agent of the asserted principal, 'is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, * * * so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough.' "

It is necessary to make a determination if there was sufficient evidence of reliance on the part of Clyde Crane concerning the holding out of Floyd Britt as the apparent agent of Union Oil Company. A review of the testimony fails to reveal any such reliance on the part of Clyde Crane. In fact, the evidence is fairly strong that the reason that Clyde Crane did business with Floyd Britt was because of his personal and family relationship with Mr. Britt.

The evidence showed that Clyde Crane was 17 years of age on the date of the accident. He had known Floyd Britt all of his life. He had been personally trading with "Mr. Floyd" for about a year and a half before the accident; that he had "always traded up at Mr. Floyd's"; that he didn't trade anywhere else unless he was out of town; and that his father and his brother did business with "Mr. Floyd." Mr. Britt testified that when he ran a Texaco Service Station the Crane family had traded with him, and when he moved up to a Pure Oil station they moved their trade to his new location. The following appears in the transcript:

"Q Now, you say that you have known Mr. Britt—You call him Mr. Floyd?

"A Yes, sir.

"Q Does your daddy do business with him?

"A Yes, sir.

"Q And your brother?

"A Yes, sir.

"Q All of you?

"A Yes, sir.

"Q All right. Now, how did you pay when you went down there? Did you pay in cash or charge it or put it on a credit card?

"A We charged it and paid it on Friday.

"Q He just extended credit to you or to your daddy or to who?

"A Me and my daddy and my brother.

"Q All right. And Mr. Britt, whenever you went in there to buy something, would just write it down somewhere?

"A Write it down on a tablet.

"Q All right. And did he ever send you a bill?

"A No, sir, we always came by and paid it.

"Q You just went by on Friday?

"A Yes, sir.

"Q And paid him in cash?

"A Yes, sir.

"Q Did you ever use a Pure credit card?

"A No, sir, we always came by and paid it.

"Q You just went by on Friday?

"A Yes, sir.

"Q And paid him in cash?

"A Yes, sir.

"Q Did you ever use a Pure credit card?

"A No, sir.

"Q Did you have a Pure credit card?

"A No sir.

"Q Had you ever applied for one?

"A No, sir.

"Q Had your father?

"A No, sir, not that I know of.

"Q You had never had any arrangement with Pure Oil Company or Union Oil Company whereby you purchased items and they extended you credit, had you?

"A No, sir.

"Q And all of your dealings down there were with Mr. Britt?

"A Yes, sir."

Throughout the trial, Clyde Crane made constant references to the fact that the station was Mr. Floyd's or Mr. Britt's. There was other testimony that indicated that his attraction to Britt's Service Station had no connection to Pure Oil Company. His familiarity with the bay where the hydraulic lift was located, centered largely around a refrigerator where he would get milk.

On the occasion when this accident occurred Clyde Crane had taken his brother's automobile there to get the oil changed, the filter changed, and to get the automobile serviced. Clyde Crane testified while getting the automobile serviced, attendant Leroy Lyon did something to the carburetor and it came apart; that Leroy Lyon told Mr. Floyd he had broken the carburetor and Mr. Floyd told him he would call up Valley Chevrolet and get a piece for it. There can be no question that the testimony of Clyde Crane had strong inferences that the reason he did business with this service station was because of the personality of Floyd Britt.

The evidence is void of any inferences of reliance on the part of Clyde Crane trading there because of Pure Oil Company or Union Oil Company.

Thus the cases must be reversed for the failure of the trial court to grant the general affirmative charge on behalf of the appellant Union Oil Company and must be reversed for the failure of the trial court to grant the motion for a new trial in behalf of the appellant Union Oil Company.

The appellant Floyd Britt contends that the court erred in failing to sustain his demurrers. However, all of his grounds of demurrer are general and the court cannot be put in error for overruling a general demurrer. Smith v. Flynn, 275 Ala. 392, 155 So.2d 497; Marigold Coal, Inc. v. Thames, 274 Ala. 421, 149 So.2d 276.

Floyd Britt further contends that appellee Clyde Crane was guilty of contributory negligence since he knew that the automobile that was driven upon the lift by Floyd Britt had no brakes. However, this Court holds that under the facts and circumstances of the cases the issue of contributory negligence was for the jury. Mitchell v. Helms, 270 Ala. 8, 115 So.2d 664, and cases cited therein.

■ In connection with the other assignments of error of appellant Britt, they are not substantially argued and will be deemed waived and not considered by the Court. Rule 9(d) Revised Rules of the Supreme Court of Alabama; Reynolds v. Henson, 275 Ala. 435, 155 So.2d 600; and Barrett v. Hanks 275 Ala. 383, 155 So.2d 339.

There appearing to be no error in the record as it would apply to appellant Floyd Britt, the judgments are affirmed as to appellant Floyd Britt, but reversed and remanded as to appellant Union Oil Company of California.

Affirmed as to appellant Floyd Britt.

Reversed and remanded as to appellant Union Oil Co. of Cal.

COLEMAN, HARWOOD, BLOOD-WORTH and McCALL, JJ., concur.