857 So.2d 71 (2003)
Ronda K. KENNEDY
v.
The WESTERN SIZZLIN CORPORATION.
Lisa M. Pate
v.
The Western Sizzlin Corporation.
Eloise E. Webb et al.
v.
The Western Sizzlin Corporation.
1010804, 1010805 and 1011210.
Supreme Court of Alabama.
March 7, 2003.
*72 Desmond V. Tobias of Windom & Tobias, L.L.C., Mobile, for appellants Ronda K. Kennedy and Lisa M. Pate.
John D. Saxon and Symantha Christeen Thomas of John D. Saxon, P.C., Birmingham; and Tammy C. Woolley of Gorham & *73 Waldrep, P.C., Birmingham, for appellants Eloise Webb, Rebecca R. Frye, Hope Daniels Cassidy, Emma Diane Foley, Wyonia Lipscomb, and Jeannette T. Lassiter.
Kenneth A. Hitson, Jr., of Nix, Holtsford, Gilliland, Higgins & Hitson, P.C., Daphne; and Mickey Womble, Monroeville, for appellee.
SEE, Justice.
Ronda Kennedy, Lisa Pate, Eloise Webb, Rebecca Frye, Hope Daniels Cassidy, Emma Diane Foley, Wyonia Lipscomb, and Jeanette Lassiter appeal from summary judgments entered in favor of The Western Sizzlin Corporation ("WSC") on several claims alleging vicarious tort liability and negligence. This appeal presents two issues: (1) whether an agency relationship existed between WSC and its franchisee; and (2) whether WSC, in moving for a summary judgment, properly shifted the burden of proof as to each of the direct-negligence claims brought by Kennedy and Pate (case nos. 1010804 and 1010805).
We hold that an agency relationship did not exist between WSC and its franchisee and, therefore, that summary judgments for WSC on the claims alleging vicarious liability and negligent or wanton hiring, training, supervision, and retention were proper. However, we also hold that WSC did not meet its burden of proof when moving for a summary judgment on the direct-negligence claims brought by Kennedy and Pate, and, therefore, that summary judgments on those claims were improper. Consequently, we affirm in part, reverse in part, and remand in case no. 1010804 and case no. 1010805, and we affirm in case no. 1011210.

I.
Bryan Kogut and Robert Lambert are the sole stockholders of Lambert Restaurant Company, Inc. ("LRC"). In January 1998, Kogut and Lambert, in their individual capacities and on behalf of LRC, entered into an agreement with WSC pursuant to which LRC obtained a franchise to operate a Western Sizzlin restaurant in Monroeville. Kogut served as the president of LRC, and Lambert served as the vice president, managing the daily operations of the restaurant. The restaurant first opened for business on Mother's Day 1998.
Lambert has a history of sexual misconduct and sexual harassment in the workplace, including a criminal conviction for attempted sexual abuse. Before managing the Western Sizzlin restaurant, Lambert had worked as a district manager for the Waffle House restaurant chain in Florida. Waffle House terminated Lambert's employment following its investigation of a sexual-harassment claim.
Kennedy, Pate, Webb, Frye, Cassidy, Foley, Lipscomb, and Lassiter are all former employees of the Western Sizzlin restaurant in Monroeville. On August 1, 1998, Webb contacted Kogut after several employees reported that Lambert had sexually harassed them.[1] Kogut spoke to Lambert about those allegations and instructed him that he should not return to *74 the restaurant. Lambert did not return to the restaurant until some time in late November 1998.
On August 3, 1998, Kogut called Jerry Plunkett, director of franchise operations at WSC, to inform him of the sexualharassment allegations the employees had made against Lambert. Kogut also asked Plunkett whether, in light of those allegations, there was anything he could do to terminate the franchise agreement as to Lambert. Plunkett responded that legally WSC could do nothing under the franchise agreement unless and until Lambert was arrested or criminally charged.
On November 5, 1998, Cassidy filed with the Equal Employment Opportunity Commission ("EEOC") a sexual-harassment charge against Lambert, in his capacity as one of the owners of the Western Sizzlin restaurant in Monroeville. The other employees in this case filed similar complaints during the succeeding months. On September 11, 2000, the EEOC issued determination letters regarding the merits of each of those claims, finding reasonable cause that Lambert had subjected the employees and other females to sexual harassment and to a hostile working environment in violation of Title VII of the Civil Rights Act of 1964.
On November 23, 1998, despite Kogut's pleas that he stay away, Lambert returned to the restaurant to resume the general management of the restaurant. After Lambert's return, Kogut continued his discussions with WSC management regarding how he might be able to salvage the situation and terminate Lambert's interest in the franchise. With Lambert back at the restaurant, sales began to fall, causing LRC to fall severely behind in its debt obligations. On May 17, 2000, LRC's mortgagee foreclosed on its franchise. On May 18, 2000, WSC terminated its franchise agreement with LRC, pursuant to section 11.2(b)(iii) of the franchise agreement, which allows WSC to terminate the agreement in the event of foreclosure by a creditor.
On April 21, 2000, Webb, Frye, Cassidy, Foley, Lipscomb, and Lassiter (case no. 1011210) (hereinafter referred to collectively as "Webb") sued WSC, asserting claims of negligent hiring, training, and supervision; assault; battery; invasion of privacy; intentional infliction of emotional distress; breach of contract; and fraud. They also sued Lambert and LRC, asserting similar claims. On June 2, 2000, Kennedy (case no. 1010804) and Pate (case no. 1010805) sued WSC, asserting claims of assault and battery; invasion of privacy; negligent or wanton hiring, supervision, and/or retention of employment; and the tort of outrage. Kennedy and Pate also sued Lambert and LRC on claims of assault and battery, invasion of privacy, and the tort of outrage. Webb, Kennedy, and Pate each amended their complaint to assert a direct-negligence claim against WSC. In all three cases, the trial court entered default judgments against Lambert and LRC.
On November 1, 2000, WSC moved for a summary judgment as to each claim brought against it by Kennedy and Pate, arguing that no agency relationship existed between Lambert and WSC, or, alternatively, that it never authorized or ratified Lambert's conduct and that the alleged acts were outside the scope of Lambert's employment. In support of *75 each motion, WSC filed a statement of facts and a brief. In each action, WSC failed to state the basis for its summary-judgment motion on the direct-negligence claim in either its motion or brief.
On December 27, 2000, WSC moved for a summary judgment on each claim brought against it by Webb. The statement of facts and the brief it filed in support of that motion were identical to those it filed in the Kennedy and Pate cases. On September 10, 2001, WSC filed a supplemental argument in support of its motion for a summary judgment in Webb's case,[2] arguing (1) that as to the direct-negligence claim it had no duty of care, and (2) that Webb failed to present substantial evidence creating a genuine issue of material fact as to the fraud and breach-of-contract claims. The trial court entered a summary judgment for WSC on all claims in each of the three cases.

II.
Kennedy, Pate, and Webb argue that an agency relationship existed between WSC and LRC and between WSC and Lambert and, therefore, that WSC is vicariously liable for the intentional torts committed by Lambert in the scope of his employment and is liable for its negligent and/or wanton hiring, training, supervision, and retention of Lambert. In addition, Kennedy and Pate argue that WSC did not carry its initial burden in moving for a summary judgment on each of their direct-negligence claims and, therefore, that summary judgments on their direct-negligence claims were improper.

A.
Kennedy, Pate, and Webb contend that an agency relationship was created between WSC, on the one hand, and LRC and Lambert, on the other, by WSC's retaining a right to control the operations at the Monroeville Western Sizzlin restaurant. They rely on the following provisions in the franchise agreement between WSC and LRC to support their proposition:
"7.3 Operations Manual
"(a) You shall operate the Franchised Business in strict compliance with a [sic] standard procedures, policies, rules and regulations established as incorporated in Our operations manual(s) as same may be amended and revised from time to time, including all bulletins, supplements, and ancillary materials (collectively referred to herein as the `Operations Manual'). The subject matter of the Operations Manual may include, but not be limited to, matters such as: forms, information relating to product and menu specifications, cash control, purchase orders, general operations, labor schedules, personnel, Gross Sales reports, payroll procedures, training and accounting, safety and sanitation, design specifications and color of uniforms, display of signs and notices, authorized and required equipment and fixtures, including specifications therefor, Trademark usage insurance requirements, lease requirements, decor, standards for management and personnel, hours of operation, yellow page and advertising *76 formats, standards of maintenance and appearance of the Restaurant.
"(b) We shall have the right to modify the Operations Manual at any time and from time to time by the addition, deletion, or other modification to the provisions thereof. All such modifications shall be equally applicable to all similarly situated franchisees who are required by their franchise agreement to comply therewith, and no such modification shall alter Your fundamental status and rights under this Agreement. Modifications in the Operations Manual shall become effective upon delivery of written notice thereof to You unless a longer period is specified in such written notice. The Operations Manual, as modified from time to time as hereinabove provided shall be an integral part of this Agreement and reference made in this Agreement, or in any amendments, exhibits or schedules hereto, to the Operations Manual shall be deemed to mean the Operations Manual kept current by amendments from time to time....
". . . .
"7.6 Right of Inspection
"(a) We shall have the right from time to time, and without prior notice to You, to send representatives to the Restaurant, to inspect Your operations, business methods, service, management, financial records and administration, and to determine the quality thereof and the faithfulness of Your compliance with the provisions of this Agreement and the Operations Manual and You shall cooperate fully with Us and Our representatives and agents with respect to such inspections...."
In addition to relying on the language of the franchise agreement, Kennedy, Pate, and Webb rely on the fact that WSC employees trained Lambert and certain other LRC employees and that they conducted periodic inspections of the restaurant. They claim that those circumstances, along with the franchise agreement, provide sufficient evidence of an agency relationship between WSC, on the one hand, and LRC and Lambert, on the other. We disagree.
We have clearly stated the standard of appellate review of a summary judgment:
"The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
"... Ala.Code 1975, § 12-21-12, mandates that the [defendants] meet their burden by `substantial evidence.' Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Under the substantial evidence test the nonmovant must present `evidence of such weight and quality that fair-minded *77 persons in the existence of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)."
Brewer v. Woodall, 608 So.2d 370, 372 (Ala.1992).
A franchise agreement, without more, does not make the franchisee an agent of the franchisor. Carlton v. Alabama Dairy Queen, Inc., 529 So.2d 921, 924 (Ala.1988). When a plaintiff is alleging liability based on the doctrine of respondeat superior, the test for determining whether an agency relationship exists is "whether the alleged principal reserved a right of control over the manner of the alleged agent's performance." Wood v. Shell Oil, 495 So.2d 1034, 1036 (Ala.1986). However, "[t]he retained right to supervise the alleged agent to determine if that person conforms to the performance required by a contract with the asserted principal does not, itself, establish control." Id.
We recognize that a summary judgment on the issue of agency is generally inappropriate because agency is a question of fact to be determined by the trier of fact. Wood, supra. "This is not to say, however, that agency may be presumed; the party asserting it has the burden of adducing [substantial] evidence to prove its existence." 495 So.2d at 1035-36 (citing Federal Land Bank of New Orleans v. Jones, 456 So.2d 1 (Ala.1984)). In opposition to WSC's motions for a summary judgment, Kennedy, Pate, and Webb failed to present substantial evidence of the existence of an agency relationship between WSC, on the one hand, and LRC and Lambert, on the other. Specifically, they presented no evidence indicating that WSC controlled the day-to-day operations of the Monroeville restaurant. Rather, WSC's control was limited to ensuring that LRC complied with the franchise agreement and, in turn, the operations manual. The operations manual was designed to ensure uniformity in service among Western Sizzlin franchises. Although WSC did train LRC employees, including Lambert, the purpose of this training was to encourage compliance with the operations manual.
Further evidence of WSC's absence of control over the restaurant's operations can be seen in the period following the date on which the employees first brought allegations of sexual harassment against Lambert. When informed of the employees' complaints, WSC told Kogut that its hands were tied unless Lambert's actions constituted a breach of the franchise agreement. WSC could not terminate the franchise agreement based on Lambert's alleged sexual harassment until it or Lambert received notice from a governmental agency that he was violating the law. The EEOC issued its determination letter in November 2000. As of that date, however, WSC had already terminated the franchise agreement on other, purely financial, grounds.
LRC, that is, Kogut and Lambert, retained sole control over employment decisions at the restaurant. At the start of the venture, they (not WSC) decided that Lambert was going to be the general manager of the restaurant, and under the franchise agreement WSC had no authority to interfere with this decision.
Kennedy and Pate argue, in the alternative, that even if there is no actual agency relationship in this case, Lambert acted with the apparent authority of WSC. Apparent authority is inferred from the conduct of the principal. That is, it is authority that "`the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses.'" Union Oil Co. v. Crane, 288 Ala. 173, 178, 258 So.2d 882, 885 (1972) *78 (quoting Pearson v. Agricultural Ins. Co., 247 Ala. 485, 488, 25 So.2d 164, 167 (1946)). Although Kennedy testified that she thought that WSC and LRC were the same entity, neither Kennedy nor Pate offered any evidence indicating that WSC did anything to create an appearance of authority in Lambert. Bare assertions are not evidence, much less substantial evidence. Ex parte Awtrey Realty Co., 827 So.2d 104, 109 (Ala.2001). Moreover, there is no evidence indicating that WSC permitted Lambert to hold himself out as its agent. In fact, the franchise agreement specifically prohibits doing so:
"14.1 Relationship of Franchisee to Company
"... You have no authority to create or assume in Our name or on Our behalf, any obligation, express or implied, or to act or to purport to act as our agent or representative on Our behalf for any purpose whatsoever."
Therefore, we do not conclude that an agency relationship existed between WSC, on the one hand, and LRC and Lambert, on the other, under a theory of apparent authority.[3]

B.
Kennedy and Pate contend that WSC did not meet its burden of proof in moving for a summary judgment on each of their direct-negligence claims. We agree.
"`[A] party seeking a summary judgment always bears the initial responsibility of informing the [trial] court of the basis of its motion.'" Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala.2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). When a motion for a summary judgment is based on a failure of the nonmovant's evidence, the moving party must indicate where the nonmovant's case suffers an evidentiary failure. Id. We have read the summary-judgment motions and the accompanying briefs WSC filed in the Kennedy and Pate cases, and we note that WSC did not devote any portion of its argument to the direct-negligence claims. Accordingly, the burden of creating, by substantial evidence, a genuine issue of material fact as to the direct-negligence claims never shifted to Pate and Kennedy; therefore, the trial court's summary judgments were improper as to the direct-negligence claims.

III.
The remaining arguments of Kennedy, Pate, and Webbthat WSC authorized and/or ratified Lambert's tortious conduct; that WSC was on notice or that it had knowledge of Lambert's tortious conduct; that WSC failed to take adequate steps to remedy the tortious conduct; and that Lambert committed the tortious acts within the line and scope of his employmentare all premised on our holding that there was an agency or employee-employer relationship between WSC and Lambert. Because we have concluded that there was no agency relationshipeither actual or apparentbetween them, there is no need to address these remaining arguments.

*79 IV.
In case no. 1010804 and case no. 1010805, we reverse the summary judgments as to the direct-negligence claims only, affirm the summary judgments as to the remaining claims, and remand the case to the trial court for further proceedings consistent with this opinion. In case no. 1011210, we affirm the summary judgment in its entirety.
1010804 and 1010805AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1011210AFFIRMED.
HOUSTON, BROWN, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially in part.
LYONS, J., concurs in the result.
MOORE, C.J., and HARWOOD and WOODALL, JJ., concur in part and dissent in part.
JOHNSTONE, Justice (concurring specially in part).
But for one exception I concur. The exception is that I express no opinion on the propriety of summary judgment on Webb's claim against WSC for its own negligence in case number 1011210.
In all three cases my concurrence on the issue of apparent authority is restricted to the particular scenario and issue presented by these cases: whether any acts by the franchisor-alleged-principal WSC caused the franchisee-alleged-agent Lambert to appear to Lambert's own employees to be the agent of WSC. The cases now before us do not address any claims by any of Lambert's customers, invitees, vendors, or others who were not Lambert's own employees that any such non-employees were entitled to rely on apparent authority in Lambert to act as agent for WSC. The validity of any person's claim that he or she has relied on apparent authority in an alleged agent depends in part on whether acts by the alleged principal reasonably foreseeably conveyed to the particular claimant an appearance of agency in the alleged agent.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur in affirming the summary judgments in favor of WSC, but I respectfully dissent from the reversal of that portion of the summary judgments in case no. 1010804 and case no. 1010805 dealing with direct negligence by WSC.
Plaintiff Lisa Pate states in her complaint:
"46. At the times and places made the basis of this lawsuit, the Plaintiff, Lisa M. Pate, sustained the injuries and damages complained of which were proximately caused by the negligence of the Defendants, Western Sizzlin Corporation, and fictitious parties A, B, C, D, E, and/or F, in one or more of the following respects:
"a) Negligently allowing Lambert Restaurant Company and Robert N. Lambert to obtain, purchase, maintain, manage, and supervise a Western Sizzlin franchise, which acts constitute negligence on behalf of Western Sizzlin Corporation;
"b) Negligently failing to establish safe work practices and procedures for maintaining the premises and work environment in a safe condition for the Plaintiff and other employees;
"c) Engaging in a course of action in reference to Lambert Restaurant Company and Robert N. Lambert which constitutes negligence on behalf of Western Sizzlin Corporation." *80 Kennedy's allegations in her second amended complaint of "direct negligence" are identical to those of Pate.
This Court has determined that no agency relationship existed in those cases. The so-called "direct-negligence" claims alleged are claims that Alabama courts have never recognized. The trial court entered summary judgments for WSC on "all counts as to all claims against it"the logical result considering the fact that the trial court also found no agency relationship to exist.
Therefore, I dissent from the reversal of the summary judgments on the "direct-negligence" claims of Pate and Kennedy.
HARWOOD, Justice (concurring in part and dissenting in part).
I respectfully dissent in all three appeals as to the holding expressed in Part II.A. of the main opinion that there was not sufficient evidence presented to create a genuine issue of material fact as to whether an agency relationship existed between WSC, on the one hand, and LRC and Lambert, on the other hand. I concur in the holding expressed in Part II.B. of the opinion that a genuine issue of material fact exists relative to the claims against WSC alleging direct negligence, sufficient to require a reversal as to that issue of the summary judgments granted WSC.
I agree with the main opinion that the mere existence of a franchise agreement does not per se make the franchisee the agent of the franchisor, but rather the test remains whether the franchisor reserves a right of control over the manner of the franchisee's performance.
I find the following passages from the "Brief of Appellants" to be supported by the record as to their factual references, and I adopt these passages as a fair summary of the additional evidence of retained right of control, which, combined with that set out in the main opinion, persuades me that a genuine issue of material fact exists at this stage of the proceedings:
"It is clear from the franchise agreement between [WSC] and LRC that [WSC]'s Operations Manual, as well as ancillary manuals which were provided to LRC, such as the Management Training Manual Management Skills, New Restaurant Opening Manual, and the Skills Training Guides, are incorporated as part of the terms and conditions of the franchise agreement. [WSC] also reserves the right in § 7.6 of the franchise agreement to send representatives to the restaurant to inspect the operations, business methods, service, management, financial records and administration, and to determine the quality thereof and `the faithfulness of Your compliance with the provisions of this agreement and the Operations Manual,' again referencing that LRC was required to comply with the provisions of not only the franchise agreement but also the Operations Manual. (C. at 510, 932a, 933).... Reference to compliance with the Operations Manual is also made in the Training and Supervision section of the franchise agreement between LRC and [WSC]:
"`(e) We may, from time to time, in Our discretion, cause Our field representatives to visit Your Restaurant for the purpose of rendering advice and consultation or training, with respect to the Restaurant, its operation and performance, and compliance by You with the Operations Manual.'
"(C. at 513)....
"The Operations Manual provided to LRC consists of approximately 900 pages. The topics covered by the manual are Food Safety & Sanitation; Human Resources; Management Systems; Marketing; Purchasing; Restaurant Accounting; *81 Risk Management; Training; and Staff Positions. (C. at 1060). The Management Training Manual Management Skills consists of approximately 500 pages. The topics covered by this manual are the same as those covered in the Operations Manual with the exception of Staff Positions, and it contains most of the same documents. (C. at 2439). Both manuals have Human Resources sections which provide detailed policies and procedures with regard to all aspects of employment. The manuals provide detailed policieswhich franchisees must comply withon how to find and attract workers, covering topics such as staffing requirements, job descriptions, essential job functions, work force, recruiting focus, and sources of employees and ways of recruiting those particular sources; how to interview, select, and hire employees; how to retain employees; legal considerations in recruiting and hiring employees, compensation and benefits, regulating the workforce, recordkeeping and notices; and evaluating, disciplining and terminating employees.
"In addition, [WSC] provides numerous forms, including, but not limited to, staffing requirements for a new store; staffing requirements for continuing operations; job description summaries; essential job functions; ad samples; hourly applications for employment; management applications for employment; addendums for applications for employment; application review forms; forms on how to interview; sample interview questions; interview inquiry guidelines; reference check worksheets; employee withholding authorization forms; co-worker performance evaluations; attendance records; disciplinary reports; employment eligibility forms; new hire first day checklist; co-worker handbook sample; uniform program and order form; name tag order form; sexual harassment complaint form; payroll deduction forms; employee action form; employee information form; management review form; employee month/year qualification program; and counseling report forms. (C. at 1018-19, XXXX-XXXX).
"The Skills Training Guides were provided to LRC for the eleven staff positions at LRC. Each manual instructs the employee on how to perform his or her job. (C. at 1028, 2459-2776). The New Restaurant Opening Manual instructs the franchisee on planning and building a Western Sizzlin restaurant; tells them what to expect; provides an eighteen (18) week countdown which provides a detailed `to do' list for the franchisee; instructs the franchisee how to prepare food bar layouts and place the initial food orders; provides an opening week labor schedule; provides information on pricing, menu development, and advertising; provides checklists for pre-closing and closing; provides a training agenda; and provides numerous backup forms. (C. at 1018, 2778-2997).
"[WSC] provides training at its corporate store for owners and managers of franchises, as well as its own managers. The training includes familiarizing the trainee with the procedures of [WSC] and other operations of the restaurant, including, but not limited to, preparing food; labor schedules; quality control; cleanliness; service requirements; personnel matters within the Operations Manual; training on the progressive discipline policy; and training on sexual harassment. In essence, the purpose of the training is to learn the way [WSC] operates a restaurant. The training provided to the franchisees is substantially the same as that provided to [WSC's] managers. (C. at 764-66, 976, 1052, 946-47, 1029). Tests are administered *82 as to each section of training completed. (C. at 980). While the training is certainly geared toward food preparation and the practical dos and don'ts of running a restaurant, there is significant training and emphasis on personnel and human resource issues.
"[WSC] also conducted pre-opening training for LRC; provided on-site training; assisted in setting up personnel records; and discussed the discipline of employees, among other things. (C. at 778-79, 781-82, 914-16, 990, 993).
"[WSC's] franchise field consultants visited the Monroeville franchise at least once a month, consulting with Mrs. Webb and Mr. White [assistant managers] about `anything to do with operating a restaurant,' and ensuring the restaurant was being operated in the manner in which they had been trained by [WSC]. (C. at 777-78). The franchise field consultant's job was to assist the franchise `in any way,' and Mr. Dean, the franchise field consultant for the Monroeville franchise, was summoned to Monroeville on several occasions to assist the managers of that restaurant in the daily operation of the Monroeville restaurant. (C. at 985-86). He discussed personnel matters and issues with them such as the number of servers on the floor; scheduling more training for employees; and sitting down with the servers, going through the procedures of service, observing their performance, and providing feedback about the manner in which they performed their job. (C. at 995). It is clear that [WSC] had substantial involvement with LRC's personnel practices and procedures, and by mandating that LRC comply with these myriad manuals, to include human resources matters, [WSC] retained a very strong right of control over LRC."
(Appellants' brief at pp. 41-47, emphasis in original.)
While it may be an overstatement to say that WSC retained "a very strong" right of control over LRC, the degree of retained control evidenced by the aggregate of all aspects of the parties' relationship is sufficient to create a genuine issue of material fact as to the extent of that control.
WOODALL, Justice (concurring in part and dissenting in part).
I concur in case no. 1010804 and case no. 1010805 insofar as the summary judgments as to the direct-negligence claims are reversed. As to case no. 1011210, I respectfully dissent.
"As this Court has held, `the existence and scope of an agency relationship are questions of fact to be determined by the jury.'" Lee v. YES of Russellville, Inc., 784 So.2d 1022, 1028 (Ala.2000) (quoting Standard Plan, Inc. v. Tucker, 582 So.2d 1024, 1029 (Ala.1991)). I believe that the plaintiffs offered substantial evidence that WSC retained a right of control over the manner in which the Western Sizzlin restaurant was operated. Therefore, I would reverse the judgments of the trial court, and remand the cases for further proceedings.
NOTES
[1] The allegations against Lambert include forcible rape, unwanted sexual touching, and inappropriate sexual remarks. Because WSC does not challenge the veracity of those claims for purposes of this appeal, it is not necessary to discuss in detail the employees' sexual-harassment claims.
[2] On appeal, Webb argues that the trial court should not have considered WSC's supplemental argument because, she says, it was not filed in accordance with the notice requirements set forth in Rule 56(c)(2), Ala. R. Civ. P. However, because Webb did not object in the trial court, this issue was not properly preserved for appellate review.
[3] Kennedy and Pate do not allege, or offer any evidence indicating, that they relied to their prejudice on their alleged understanding that WSC and LRC were "one in the same." See Union Oil, 288 Ala. at 178, 258 So.2d at 885-86 ("`When one has reasonably and in good faith been led to believe ... that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency.'" (quoting Halle v. Brooks, 209 Ala. 486, 487, 96 So. 341, 342 (1923))). Nonetheless, because WSC never "permitted the appearance of authority" in Lambert, any such reliance by Kennedy or Pate would have been unjustified. Id.